**Joseph Patrick DOHERTY, Petitioner,**

**v.**

**U.S. DEPARTMENT OF JUSTICE, IMMI-GRATION AND NATURALIZATION SERVICE, Respondent.**

**Nos. 662, 880, Dockets 88–4084, 89–4092.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 19, 1990.

Decided June 29, 1990.

Mary Boresz Pike, New York City (Somerstein & Pike, Arthur C. Helton, Lawyers Committee for Human Rights, of counsel), for petitioner.

Noel Anne Ferris, New York City, Sp. Asst. U.S. Atty. (Otto G. Obermaier, U.S. Atty. S.D. New York, Edward T. Fergusson, III, Asst. U.S. Atty., of counsel), for respondent.

Carolyn Patty Blum, Berkeley, Cal. (Asylum Appeals Clinic, Boalt Hall Law School, Berkeley, Cal., Kevin R. Johnson, King Hall School of Law, Davis, Cal., Lynn Bregman, John K. Lapiana, Wilmer, Cutler & Pickering, Washington, D.C., of counsel, Lauren Cox–Pursley, Ann Lucas, Luis Moran, Barbara Schussman, Kathleen Soltero, Student Counsel, on the Brief), for Alphonse D'Amato, Christopher J. Dodd, John F. Kerry, Orrin G. Hatch, Members of the United States Senate, Gary L. Ackerman, Helen Delich Bentley, Robert A. Borski, Albert G. Bustamante, Thomas R. Carper, William J. Coyne, Ronald V. Dellums, Thomas J. Downey, Bernard J. Dwyer, Eliot L. Engel, Walter E. Fauntroy, Vic Fazio, Hamilton Fish, Jr., Sam Gejdenson, Benjamin A. Gilman, Charles A. Hayes, George J. Hochbrueckner, Frank Horton, Barbara Kennelly, Peter H. Kostmayer, Nita M. Lowey, Thomas A. Luken, Thomas J. Manton, Edward J. Markey, Michael R. McNulty, Nicholas Mavroules, Raymond J. McGrath, Bruce A. Morrison, Robert J. Mrazek, Richard Neal, Major R. Owens, Charles B. Rangel, Edward R. Roybal, Marty Russo, James H. Scheuer, Charles E. Schumer, Edolphus Towns, Curt Weldon, Members of the U.S. House of Representatives, amici curiae.

Donald L. Ungar, San Francisco, Cal. (Simmons, Ungar, Helbush, DiCostanzo & Steinberg, of counsel), for American Immigration Lawyers Ass'n, amicus curiae.

Before LUMBARD, FEINBERG, and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Joseph Patrick Doherty, a member of the Provisional Irish Republican Army ("PIRA") who has been imprisoned in this country since 1983, petitions this court to review: (1) an order of former Attorney General Edwin Meese III, dated June 9, 1988, that rejected Doherty's designation of the Republic of Ireland as his country of deportation; and (2) an order of Attorney General Richard Thornburgh, dated June 30, 1989, that denied Doherty's motion to reopen his deportation proceedings for the purposes of applying for asylum and for withholding of deportation. For the reasons that follow, we affirm the order of Attorney General Meese, reverse the order of Attorney General Thornburgh, and remand for further proceedings.

## BACKGROUND

Doherty's status in this country has been the subject of sustained litigation since 1983, and so far has given rise to four published court opinions, *Doherty v. Meese*, 808 F.2d 938 (2d Cir.1986); *United States v. Doherty*, 786 F.2d 491 (2d Cir.1986); *United States v. Doherty*, 615 F.Supp. 755 (S.D.N.Y.1985); *Matter of Doherty*, 599 F.Supp. 270 (S.D.N.Y.1984), familiarity with which is assumed. Throughout all these proceedings, Doherty has been detained in the Metropolitan Correctional Center in Manhattan.

The events leading to Doherty's arrest in the United States stem from his involvement in the shooting death of a British army captain in Belfast, Northern Ireland. On May 2, 1980, Doherty and three other members of the PIRA set up an ambush in a private home in North Belfast as part of a plan to surprise and attack a convoy of British soldiers. After the men had waited three or four hours, a car pulled up in front of the house and five members of the British Army's Special Air Services emerged. In an ensuing gun battle, one of the British soldiers, Captain Herbert Westmacott, was shot and killed. Doherty was arrested, charged with murder, and put on trial in Belfast, Northern Ireland; but before the court had announced a decision, Doherty and seven others escaped from the maximum security Crumlin Road prison where they were being held. Two days later the court convicted Doherty *in absentia* of

murder and a number of lesser crimes, and sentenced him to life imprisonment.

Doherty successfully eluded the British authorities. Aided by the PIRA, he fled to the Republic of Ireland and, using an assumed identity, eventually made his way to New York City where he escaped detection for another sixteen months, until June 18, 1983, when he was arrested by agents of the Immigration and Naturalization Service ("INS") while working in a bar on the Upper East Side of Manhattan.

Immediately after Doherty's arrest in New York, the United States Attorney for the Southern District of New York, on behalf of the United Kingdom, filed a formal petition for his extradition. The case was referred to District Judge John E. Sprizzo, who elected to hear the matter as an "extradition magistrate" pursuant to 18 U.S.C. § 3184. At about the same time, the United States' initiation of deportation proceedings against Doherty prompted him to apply for asylum. At Doherty's request, the deportation proceeding and request for asylum were held in abeyance pending the outcome of the extradition action.

On December 12, 1984, Judge Sprizzo ruled that Doherty's crimes in Northern Ireland were "political offenses" within the meaning of the extradition treaty between the United States and the United Kingdom, and that Doherty's extradition was therefore barred. 599 F.Supp. 270; see Treaty of Extradition Between the United States and the United Kingdom of Great Britain and Northern Ireland, Art. V(1)(c)(i), 28 U.S.T. 227, T.I.A.S. No. 8468 (effective Jan. 21, 1977) (extradition shall not be granted for offenses "of a political character"). Based on the highly organized, quasi-military nature of the PIRA, its mode of discipline and internal command structure, as well as the historical context of Irish-British conflict and the fact that Doherty's acts of violence were directed at soldiers rather than civilians, Judge Sprizzo concluded that Doherty's involvement in the ambush and his subsequent escape from prison were of a political character. According to Judge Sprizzo, "the facts of this case present the assertion of the political offense exception in its most classic form." 599 F.Supp. at 276.

Unable to appeal Judge Sprizzo's extradition decision directly, see Matter of Mackin, 668 F.2d 122 (2d Cir.1981) (denial of extradition not appealable), the United States sought collateral review of the order by way of a separate action for declaratory judgment. The district court dismissed that action for legal insufficiency, however, 615 F.Supp. 755, and we affirmed the dismissal. 786 F.2d 491.

With the extradition matter completed, the deportation proceeding against Doherty resumed in September 1986. At this point, Doherty decided to take advantage of a provision in the immigration statute that allows a deportable alien to select the country to which he will be deported. See Immigration and Nationality Act of 1952 ("INA" or "act") § 243(a), 8 U.S.C. § 1253(a). Doherty wanted to be sent to the Republic of Ireland, where he faced only a 10–year sentence of imprisonment rather than the life sentence awaiting him in Northern Ireland, and the Republic of Ireland had indicated its willingness to accept him. Therefore, at a hearing before Immigration Judge ("IJ") Howard I. Cohen, Doherty withdrew his application for asylum, conceded deportability, and designated the Republic of Ireland as his country of deportation.

The INS opposed Doherty's attempt to arrange deportation to the Republic of Ireland, claiming that it would be prejudicial to American interests not to return him to British authorities. Counsel for the INS stated that the case was of great concern "at the highest levels" of government. Despite the INS's objections, IJ Cohen ordered Doherty deported to the Republic of Ireland, as Doherty had requested, and the INS appealed immediately.

Four days after IJ Cohen's decision, Doherty petitioned for a writ of habeas corpus seeking immediate deportation to the Republic of Ireland. Doherty claimed that the government was improperly detaining him during the administrative appeal of IJ Cohen's order solely to ensure that Doherty would be available for extradition under

a newly signed treaty between the United States and the United Kingdom. The new treaty, which retroactively eliminated the political offense bar to extradition, had been ratified by the United States Senate but had not yet been acted upon by the British House of Commons. *See* 808 F.2d at 940.

The district court rejected Doherty's attempt to short-circuit the administrative process, however, and denied the petition. This court affirmed the decision of the district court, holding that the attorney general's appeal of IJ Cohen's order was reasonably grounded in his authority under § 243(a) of the act to deny deportation to an alien's designated country if, in the judgment of the attorney general, the deportation "would be prejudicial to the interests of the United States". 808 F.2d 938.

On March 11, 1987, the Board of Immigration Appeals ("BIA" or "board") decided the government's appeal but rejected its arguments and unanimously upheld IJ Cohen's order. The board stated that "we are unwilling to find that deportation to the Republic of Ireland would be prejudicial to the interests of the United States in the absence of clear evidence to support that conclusion." In a later decision, the board reopened the case to consider a motion by the government to introduce additional evidence concerning the prejudicial impact of deporting Doherty to the Republic of Ireland, but denied the motion after reopening, principally because it found that the additional evidence could have been presented at the hearing before IJ Cohen. At the request of the INS, the board then certified the case to Attorney General Meese pursuant to 8 C.F.R. § 3.1(h), a regulation that permits the attorney general to review decisions of the board. Attorney General Meese accepted the case for review in October 1987.

On December 3, 1987, while the case was still pending before Attorney General Meese, Doherty moved before the board to reopen his deportation proceedings for the purposes of withdrawing his designation of the Republic of Ireland, redesignating the country of deportation, and submitting a new application for asylum and withholding of deportation. According to Doherty, this switch in his strategy was compelled by the implementation two days earlier of a new extradition treaty between the Republic of Ireland and the United Kingdom. Doherty feared that the new treaty, which altered the applicability of the "political offense" exception to extradition, would result in his certain extradition to the United Kingdom if he were deported to the Republic of Ireland, as he had originally requested. Without passing on its merits, the board referred Doherty's motion to reopen directly to Attorney General Meese.

In a decision dated June 9, 1988, Attorney General Meese rejected Doherty's designation of the Republic of Ireland as his country of deportation, holding under § 243(a) of the act that deportation there rather than to the United Kingdom would be prejudicial to United States' interests. He not only rejected Doherty's designation but also ordered him deported directly to the United Kingdom. The attorney general did not address the merits of Doherty's motion to reopen, however, but remanded that motion for consideration by the board.

The board granted Doherty's motion to reopen on November 14, 1988, in a 3–2 decision, holding that Doherty should be given the opportunity to apply for asylum and withholding of deportation. The board held:

> At the time of the hearing the reasonable expectation of the respondent was that he would be deported to Eire. The likelihood of his being deported to the United Kingdom appeared remote. * * * Given the state of the law at that time, the respondent could not have been expected to anticipate that he would not be deported to his country of choice. The respondent's failure to file for asylum under these circumstances is excusable.

The board further held that, like the change in Irish extradition law, the decision of Attorney General Meese represented a "changed circumstance[ ] which ha[s] arisen since the hearing". In addition, the board determined that Doherty had estab-

lished a prima facie case for relief based on a well-founded fear of persecution in Northern Ireland. The board permitted reopening only for the purposes of applying for asylum and withholding and not for withdrawing his designation and redesignating the country of deportation.

At this point, the case was once again certified to the attorney general for review, again at the request of the INS. By order dated June 30, 1989, Attorney General Thornburgh "disapproved" the board's decision and denied Doherty's motion to reopen.

Doherty petitioned this court for review of both orders of the attorneys general. The petitions were consolidated for review, and we decide both here today.

## DISCUSSION

### A. *Order of Attorney General Meese.*

Attorney General Meese determined that deporting Doherty to the Republic of Ireland would be prejudicial to United States' interests for two reasons: (1) "it is the policy of the United States that those who commit acts of violence against a democratic state should receive swift and lawful punishment, and it is thus in the interests of the United States that respondent serve his sentence in the United Kingdom"; and (2) "a decision to deport respondent to Ireland rather than the United Kingdom would be injurious to our relations with the United Kingdom." Doherty contends that Attorney General Meese abused his discretion in rejecting his deportation to the Republic of Ireland, an argument we find somewhat curious at this point since Doherty now, too, seeks to avoid deportation to that country. We find no merit to Doherty's claim in any event, and we affirm the order of Attorney General Meese.

Section 243(a) of the act grants a deportee the one-time right to select the country to which he will be deported, but it also gives the attorney general the authority to reject the selection if he determines that the deportation would be prejudicial to the interests of the United States:

The deportation of an alien in the United States provided for in this chapter, or any other Act or treaty, shall be directed by the Attorney General to a country promptly designated by the alien if that country is willing to accept him into its territory, unless the Attorney General, *in his discretion,* concludes that deportation to such country would be prejudicial to the interests of the United States.

INA § 243(a), 8 U.S.C. § 1253(a) (emphasis added).

■ As is apparent from the language of this provision, congress left the attorney general broad discretion to determine what constitutes prejudice to national interests. At an earlier stage of this case we noted that the statute provides no guidelines for determining what type of "prejudice" enables the attorney general to act; "[t]he requisite judgment requires an essentially political determination." 808 F.2d at 943. Thus the attorney general's finding of prejudice under § 243(a) "is essentially unreviewable" by a court. *Id.* at 944. We also stated that "[t]he implied corollary to the Attorney General's power to reject a designated country is the power to name the country to which the alien shall be deported." *Id.* at 941 (footnote omitted).

■ Attorney General Meese found that deporting Doherty to the Republic of Ireland, indeed to anywhere but the United Kingdom, would harm our relationship with the United Kingdom and would contradict our policy of punishing violence against democratic nations. Judgments of this nature are surely within the scope of the attorney general's discretion under § 243(a), and we are not permitted to second-guess them.

■ Doherty contends that the decision should nevertheless be overturned because of procedural error. He argues that the attorney general improperly relied on certain information, particularly an opinion letter from the Department of State, that was not in the record before the board. Although it might have been preferable if the attorney general had given Doherty an opportunity to comment on the letter, the letter itself did not reveal any new evidence

against Doherty. It merely confirmed the attorney general's own conclusions about the foreign policy implications of the case. Moreover, the attorney general made it clear that his decision was based "on the facts established in the extradition proceedings" rather than on any evidence gleaned from extra-record sources. Therefore, this procedural error, if it was an error, was of no consequence to the outcome of the decision.

B. *Order of Attorney General Thornburgh.*

Doherty moved to reopen his case in order to apply for asylum and for withholding of deportation, two separate forms of relief under the act. He also moved to reopen in order to withdraw his designation and redesignate the country of deportation, but the board did not permit, and Doherty does not here seek, reopening for these purposes. The right of asylum is established by § 208(a) of the act, which authorizes the attorney general to grant asylum to an alien who demonstrates "a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1158(a); *see I.N.S. v. Cardoza-Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Asylum under § 208(a) is a broad form of relief, allowing the alien to remain in the United States where he can eventually apply for lawful permanent residence. *See* 1 C. Gordon & S. Mailman, *Immigration Law & Procedure* §§ 1.03(6)(d)–(e) (1989).

▮▮▮▮ Withholding of deportation is governed by § 243(h) of the act. Unlike asylum, which is discretionary, withholding of deportation is a mandatory remedy that prohibits the attorney general from deporting an alien to a country where there is a clear probability that his "life or freedom would be threatened" on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1253(h); *I.N.S. v. Stevic,* 467 U.S. 407, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). Withholding of deportation under § 243(h) provides a more limited form of relief than asylum, however, barring deportation only to the nation where the alien faces persecution, but not to nonthreatening third countries.

▮▮▮▮ If Doherty had pursued these claims at his original deportation hearing, there is little doubt that he would have been entitled to the evidentiary hearing he now seeks, because the right to apply for asylum or withholding of deportation carries with it the right to a hearing "where the likelihood of persecution can be fairly evaluated." *Augustin v. Sava,* 735 F.2d 32, 37 (2d Cir.1984); *see also Maldonado-Perez v. I.N.S.,* 865 F.2d 328, 332 (D.C.Cir.1989) (applicant for asylum "must be afforded an evidentiary hearing"). But, because Doherty had withdrawn his application for asylum in September 1986 as part of his effort to arrange deportation to the Republic of Ireland, he can now have these claims heard only upon a reopening of his case. As the Supreme Court recently held, a motion to reopen for the purpose of applying for asylum and withholding of deportation may be denied for three independent reasons:

First, [the BIA] may hold that the movant has not established a prima facie case for the underlying substantive relief sought. * * * Second, the BIA may hold that the movant has not introduced previously unavailable, material evidence, or, in an asylum application case, that the movant has not reasonably explained his failure to apply for asylum initially. * * * Third, in cases in which the ultimate grant of relief is discretionary (asylum, suspension of deportation, and adjustment of status, but not withholding of deportation), the BIA may leap ahead, as it were, over the two threshold concerns (prima facie case and new evidence/reasonable explanation), and simply determine that even if they were met, the movant would not be entitled to the discretionary grant of relief.

*I.N.S. v. Abudu,* 485 U.S. 94, 104–05, 108 S.Ct. 904, 911–12, 99 L.Ed.2d 90 (1988) (citations omitted).

In rejecting Doherty's motion to reopen, Attorney General Thornburgh did not ad-

dress the first ground for denial under *Abudu*, the sufficiency of the applicant's prima facie showing of persecution. Instead, applying the second ground for denial, the attorney general held that neither the change in Irish law nor the decision of Attorney General Meese represented a change in circumstances sufficient to justify the reopening. The attorney general relied on the third ground for denial as well, holding that Doherty "would not ultimately be entitled either to the discretionary relief of asylum or to withholding of deportation." Finally, as an alternative basis for rejecting the motion, the attorney general held that Doherty's withdrawal in September 1986 of his initial application for asylum constituted a "waiver" of his right to apply at a later time.

Reviewing Attorney General Thornburgh's decision within the *Abudu* framework, we conclude that in the singular circumstances of this case he abused his discretion in denying Doherty's motion to reopen.

### 1. *Prima Facie Case.*

Because he based his decision on other grounds, Attorney General Thornburgh held that "[i]t is unnecessary for me to address (and I do not) the question whether respondent has established a prima facie case for the substantive relief sought." Therefore, since the denial of a motion to reopen can be upheld only on the grounds set forth in the decision, *see Jen Hung Ng v. I.N.S.*, 804 F.2d 534, 538 (9th Cir.1986); *Mattis v. I.N.S.*, 774 F.2d 965, 967 (9th Cir.1985), we must assume for the purpose of this appeal that Doherty did meet his burden of demonstrating prima facie eligibility for relief, as the BIA found.

### 2. *New Evidence/Reasonable Explanation.*

The attorney general ruled that Doherty had failed to demonstrate a change in circumstances since his hearing that would justify reopening the case, because neither the change in Irish extradition law nor the decision of Attorney General Meese should have come as any surprise to Doherty.

The attorney general emphasized that the diplomatic and parliamentary events that culminated in the new extradition treaty between the United Kingdom and the Republic of Ireland had been in progress for at least two years before actual implementation of the treaty on December 1, 1987. Rejection of Doherty's designation of the Republic of Ireland was also foreseeable, according to Attorney General Thornburgh, because § 243(a) expressly authorizes such rejection, and because the INS had opposed Doherty's designation at the hearing. Thus, the attorney general concluded, the "new" circumstances offered in support of Doherty's motion to reopen were in fact entirely foreseeable at the time of the original hearing, and therefore did not provide a sufficient basis for granting the motion.

■ The flaw in the attorney general's approach to this issue is that it relies on a mistaken view of the law. Doherty was required to support his motion to reopen with "previously unavailable, material evidence", and a "reasonabl[e] expla[nation of] his failure to apply for asylum initially". *Abudu*, 485 U.S. at 104–05, 108 S.Ct. at 911. Neither the regulations nor the applicable decisional law require expressly or by implication that the new evidence be "unforeseeable"; indeed, such a rule would lead to absurd consequences. If a deportee were required to make his case not just on the state of facts and the law that existed at the time of the hearing, but instead on all "foreseeable" eventualities, there would be no end to the facts and issues potentially relevant to the case. Or, as the board in this case warned, "[i]f the respondent were expected to foresee and guard against the unprecedented circumstances which arose two years later, no alien would ever fail to apply for asylum to [sic] any country to which he might remotely be deported, if he had a fear of returning there." *Matter of Doherty*, BIA File No. A26185231, at 6 (BIA Nov. 14, 1988).

We also have reason to doubt that the intervening circumstances, especially the decision of Attorney General Meese, were as "foreseeable" as the government suggests. Until this case, it appears that an

alien's designation of a country of deportation had never been rejected by the attorney general on the basis of prejudice to national interests after the designation had been approved by the board. His power to make such a decision is expressly conferred by the statute, to be sure, but one could hardly say that its exercise in this case was "foreseeable" when it had never once, in over 30 years, been invoked.

The board was on target when it found that Doherty had a "reasonable expectation" of being returned to the Republic of Ireland at the time of his original deportation hearing. What possible reason could Doherty have had for withdrawing his application for asylum and conceding deportability if his prospects of returning to his chosen country were nonexistent? He certainly could not have been motivated by a desire to delay the proceedings, as is a tactic in some cases, because delay at that time was working decidedly against him. *See Doherty*, 808 F.2d at 940.

The board gave careful consideration to the new developments supporting Doherty's motion to reopen, and it was satisfied that he had met the "heavy burden" of presenting previously unavailable, material evidence, and of reasonably explaining his decision to withdraw the initial application for relief. The board repeatedly deals with motions to reopen, and has, no doubt, developed a body of informed experience that helps it distinguish meritorious motions from those lacking in merit. Indeed, it is precisely the knowledge gained through such experience that gives us reason to defer to the board's decisions in most immigration matters.

In sum, not only did the attorney general overturn the board's findings because of a different view of the facts, but he did so under a "foreseeability" standard that has no legal foundation. This we believe constituted an abuse of his discretion. *Carcamo–Flores v. I.N.S.*, 805 F.2d 60, 68 (2d Cir.1986) (denial of asylum reversed where decision "leaves at least room for significant doubt as to whether the appropriate standard was applied"); *Gonzales Batoon v. I.N.S.*, 791 F.2d 681, 686 (9th Cir.1986)

(denial of motion to reopen is abuse of discretion where board "misapplied the principles upon which it purported to act").

Doherty supported his motion to reopen with other "new evidence", not mentioned above, including the report of a human rights group discussing political persecution in Northern Ireland, and an affidavit from his mother describing the history of mistreatment that Doherty and his family have suffered at the hands of British authorities. However, because we find that the change in Irish extradition law and the decision of Attorney General Meese were alone sufficient to satisfy Doherty's burden of producing "new, material evidence" and a "reasonable explanation" of his decision to withdraw his original application, we need not resolve the question of whether this additional "new evidence" would also have been adequate for that purpose.

### 3. Ultimate Entitlement to Withholding of Deportation.

As another ground for denying the motion to reopen, Attorney General Thornburgh held that Doherty "would not ultimately be entitled either to the discretionary relief of asylum or to withholding of deportation." We first address Doherty's ultimate entitlement to withholding of deportation. According to the attorney general, Doherty was ineligible for that remedy because, under the statutory exceptions to withholding of deportation, "there are serious reasons for considering that [Doherty] has committed a serious nonpolitical crime outside of the United States", *see* I.N.A. § 243(h)(2)(C), 8 U.S.C. § 1253(h)(2)(C), and Doherty "assisted, or otherwise participated in the persecution of * * * person[s] on account of * * * political opinion". *See* I.N.A. § 243(h)(2)(A), 8 U.S.C. § 1253(h)(2)(A).

To begin with, the mandatory nature of the withholding remedy suggests that a determination of the applicant's ultimate entitlement to relief would be improper in the context of a motion to reopen. Unlike asylum, which is discretionary with the attorney general, withholding of deportation is mandatory upon a showing of

statutory eligibility. If a person seeking to reopen his case establishes a prima facie case for withholding of deportation and introduces previously unavailable, material evidence, as Doherty has done, the attorney general simply has no discretion to decide that ultimately he would be "ineligible" for withholding of deportation, as that determination necessarily goes to the merits of the claim. As the Supreme Court stressed in *Abudu,* the attorney general's power to deny a motion to reopen based on factors other than the movant's failure to establish a prima facie case or the lack of new evidence is limited to "cases in which the ultimate grant of relief is discretionary * * * *not withholding of deportation*". 485 U.S. at 105, 108 S.Ct. at 912 (emphasis added); *see also Aviles–Torres v. I.N.S.,* 790 F.2d 1433, 1436 (9th Cir.1986) (abuse of discretion to deny motion to reopen where applicant established prima facie case for withholding of deportation); *Hernandez–Ortiz v. I.N.S.,* 777 F.2d 509, 518 (9th Cir. 1985) (same); *cf. Motamedi v. I.N.S.,* 713 F.2d 575, 576 (10th Cir.1983) (abuse of discretion to deny motion to reopen where board "prejudg[ed] the merits of the case").

■ Considering the types of issues raised by Doherty's claim for withholding of deportation, the need for an evidentiary hearing should be obvious. His ultimate success or failure will depend on, among other factors, whether his crimes in Northern Ireland are judged "political" or "nonpolitical", and whether he "persecuted" others on account of their political views or was himself the victim of such persecution. Needless to say, these issues all raise formidable questions of fact that cannot be adequately resolved in the absence of an evidentiary record. Examination of a fully developed record is a necessary precursor to the fair resolution of Doherty's claim, by an immigration judge, by the board, and, if it comes to it, by this court in another appeal. *Cf. Ananeh–Firempong v. I.N.S.,* 766 F.2d 621, 628–29 (1st Cir.1985) (questions as to whether mistreatment of applicant was "politically" motivated "are of a sort that are best considered at a hearing"). Thus, it was improper for the attorney general to prejudge the merits of Doherty's claim for withholding of deportation without the benefit of a record, and that claim must now proceed to a hearing.

### 4. *Ultimate Entitlement to Asylum.*

Whether Doherty's claim for asylum should also proceed to a hearing presents a more difficult question, because asylum, unlike withholding of deportation, is a discretionary remedy. As the Supreme Court held in *Abudu,* when an applicant seeks to reopen his case to file a claim for discretionary relief, such as a claim for asylum, the board (or, by implication, the attorney general) "may leap ahead, as it were, * * * and simply determine that * * * the movant would not be entitled to the discretionary grant of relief." 485 U.S. at 105, 108 S.Ct. at 912; *see also Cardoza–Fonseca,* 480 U.S. at 428 n. 5, 107 S.Ct. at 1211 n. 5 ("It is important to note that the Attorney General is *not required* to grant asylum to everyone who meets the definition of refugee. Instead, a finding that an alien is a refugee does no more than establish that 'the alien *may* be granted asylum *in the discretion of the Attorney General.*'") (emphasis in original) (quoting *Stevic,* 467 U.S. at 423, 104 S.Ct. at 2497); *I.N.S. v. Rios–Pineda,* 471 U.S. 444, 449, 105 S.Ct. 2098, 2101–02, 85 L.Ed.2d 452 (1985) ("if the Attorney General decides that relief should be denied as a matter of discretion, he need not consider whether the threshold statutory eligibility requirements are met").

■ Nonetheless, it is a fundamental principle of our immigration law that the attorney general must base his discretionary decisions only on the "legitimate concerns" of the relevant statutory provision. *See Rios–Pineda,* 471 U.S. at 451–52, 105 S.Ct. at 2103; *Aviles–Torres,* 790 F.2d at 1437; *Mattis,* 774 F.2d at 968. Thus, the attorney general may abuse his discretion by acting arbitrarily, departing inexplicably from established policies, or discriminating invidiously against a particular group, *Rios–Pineda,* 471 U.S. at 451, 105 S.Ct. at 2103; *Bertrand v. Sava,* 684 F.2d 204, 212 (2d Cir.1982), or by giving effect to " 'con-

siderations that Congress could not have intended to make relevant.'" *Wong Wing Hang v. I.N.S.*, 360 F.2d 715, 719 (2d Cir. 1966) (quoting *United States ex rel. Kaloudis v. Shaughnessey*, 180 F.2d 489, 491 (2d Cir.1950) (L. Hand, J.)); *see also Jen Hung Ng*, 804 F.2d at 538 ("reliance by the BIA on improper factors in reaching a decision is an abuse of discretion that we are required to reverse").

■ The issue, then, is whether the attorney general based his discretionary decision on "legitimate concerns" of asylum. Despite the attorney general's broad discretion to base other types of immigration decisions on factors such as the government's political and foreign policy interests, our examination of the asylum statute convinces us that congress intended to prevent such factors from influencing asylum cases. In exercising his discretion in this case, Attorney General Thornburgh relied on just such improper factors. We therefore must reverse his order as to the asylum claim as well.

Examination of the history and purpose of the relevant legislation shows that congress intended to insulate the asylum process from the influences of politics and foreign policy, factors that had long dominated the refugee admissions process. Before World War II, the immigration law provided no right of asylum for aliens subject to persecution in their home countries. *See, e.g., United States ex rel. Giletti v. Commissioner of Immigration*, 35 F.2d 687 (2d Cir.1929) (deportation of Italian claiming persecution by fascist regime). With the passage of the Immigration and Nationality Act of 1952, Pub.L. No. 82–414, 66 Stat. 163, congress authorized the attorney general to "withhold" deportation of aliens from countries where, in his opinion, they would be subjected to physical persecution. 8 U.S.C. § 1253(h) (amended 1965, 1980). Unlike the current law, this older form of "withholding of deportation" was entirely discretionary, and it appears to have been rarely granted. *See* Note, *Judicial Review of Administrative Stays of Deportation: Section 243(h) of the Immigration and Nationality Act of 1952*, 1976

Wash. U.L.Q. 59, 100 (1976) (no published decisions in which relief had been granted under § 243(h)). The 1952 legislation also permitted the attorney general to admit persons "temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest". 8 U.S.C. § 1182(d)(5)(A). This provision, known as "parole", was the primary vehicle for the admission of refugees before the 1980s, and it, too, was wholly discretionary with the attorney general.

In 1968, the United States became a party to the United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6257, 606 U.N.T.S. 268 ("protocol"). The protocol adopted the definition of "refugee" used in the 1951 Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 ("convention"), to which the United States had not acceded. Under the protocol and the convention, a person's status as a "refugee" was determined without regard to political considerations or the country from which the person fled. Instead, a "refugee" was defined as one who

> owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality * * *.

Article 33 of the protocol prohibited the return of such a refugee to territories "where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group, or political opinion."

Congress initially believed that the protocol was basically consistent with existing law, and that any inconsistencies could be reconciled by the attorney general in the exercise of his discretion. *See Stevic*, 467 U.S. at 417–18, 104 S.Ct. at 2494–95. In the 1970s, however, there was a growing perception that discretionary relief from deportation was being granted in a manner that conflicted with the protocol. In particular, many observers believed that asylum determinations were still being affected by ideological and geographical considerations that tended to favor individuals fleeing from communist nations over those seeking

refuge from countries having favorable political ties with the United States. *See, e.g.,* Hansen, *Behind the Paper Curtain: Asylum Policy Versus Asylum Practice,* 7 N.Y.U. Rev.L. & Soc. Change 107 (1978).

Amid growing dissatisfaction with the existing law, congress in 1980 comprehensively revised the standards and procedures governing asylum. *See* The Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat. 102. This legislation replaced the attorney general's ad hoc parole authority with a systematic procedure for adjudicating asylum claims that was intended to eliminate geographical and ideological factors from consideration. *See Stevic,* 467 U.S. at 425–27, 104 S.Ct. at 2498–2500; S.Rep. No. 96–256, 96th Cong., 2nd Sess. 1 (1979), *reprinted in* 1980 U.S.Code Cong. & Admin. News 141; Anker & Posner, *The Forty Year Crisis: A Legislative History of the Refugee Act of 1980,* 19 San Diego L.Rev. 9, 36 (1981). The statute accomplished this goal by linking eligibility for asylum to the politically neutral definition of "refugee" set forth in the protocol. *See Cardoza–Fonseca,* 480 U.S. at 436, 107 S.Ct. at 1216.

Thus, in passing the Refugee Act of 1980, congress responded to the problems created by the attorney general's theretofore unlimited discretion over the admission of refugees. By defining eligibility in politically neutral terms, congress made it clear that factors such as the government's geopolitical and foreign policy interests were not legitimate concerns of asylum. To use Judge Learned Hand's terminology, these were "considerations that Congress could not have intended to make relevant" to asylum. *Shaughnessey,* 180 F.2d at 491.

The more limited nature of the attorney general's discretion in asylum cases can be illustrated by comparing it with his authority to grant suspension of deportation, INA § 244, 8 U.S.C. § 1254, and adjustment of status, INA § 245, 8 U.S.C. § 1255, the two major forms of "discretionary" relief from deportation other than asylum. With the adoption of immigration quotas and the elimination of the statute of limitations on deportation in the 1920s, deportation in some cases was seen to create unnecessary

hardships, "[f]or there were many aliens whose residence in the United States was irregular but who had become worthy members of their communities and had established strong ties here." 3 C. Gordon & S. Mailman, *supra,* § 7.1(a).

To help mitigate the harshness of mandatory deportation, the attorney general was given the authority to suspend the deportation of aliens who had resided in the United States for at least seven years and could demonstrate "extreme hardship" if returned to their own country, INA § 244(a), 8 U.S.C. § 1254(a), especially where the hardship was the result of separation from family members legitimately living in the United States. *E.g., Carrete–Michel v. I.N.S.,* 749 F.2d 490, 494 (8th Cir.1984). For similar reasons, the attorney general was given the power to grant an "adjustment of status" to eligible aliens, and here, too, factors such as family ties and length of residence were critical. *E.g., Patel v. I.N.S.,* 738 F.2d 239, 243 (7th Cir.1984); *Jain v. I.N.S.,* 612 F.2d 683, 687–88 (2d Cir.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2155, 64 L.Ed.2d 789 (1980).

The statute itself does not set forth the factors to be weighed by the attorney general in suspending deportation or adjusting an alien's status. Both remedies "leave substantial room for the Attorney General to define the substantive grounds for relief." *LeBlanc v. I.N.S.,* 715 F.2d 685, 690 (1st Cir.1983); *see also Hernandez–Patino v. I.N.S.,* 831 F.2d 750, 753 (7th Cir.1987) ("Congress, in refusing to define 'extreme' hardship fully, avoided the substantive policy decision and has deferred to agency expertise.").

In asylum cases, by significant contrast, the substantive grounds for discretionary relief were not left to be determined by the attorney general. Indeed, one of the motivating forces behind passage of the Refugee Act was the "felt need to structure and control executive decisionmaking" in refugee matters. Anker & Posner, *supra,* at 36. Unlike the provisions for suspension of deportation and adjustment of status, the Refugee Act defines with specificity the category of aliens who should ordinarily be

granted asylum, and it provides concrete guidance as to those who should not. Moreover, while the presence of family members in the United States may work in favor of a potential asylee, *see* Helton, *The Proper Role of Discretion in Political Asylum Determinations*, 22 San Diego L.Rev. 999, 1015–18 (1985), keeping family members together is not an essential concern of asylum. In many cases, an applicant may be leaving family behind to escape persecution.

Consequently, the attorney general's broad "discretion" to grant suspension of deportation or adjustment of status does not necessarily provide a useful guide to the scope of his "discretion" to grant asylum. Even the attorney general himself acknowledged the unique characteristics of asylum in saying "that the decision to grant asylum to an alien is inherently a humanitarian act by the United States that is distinct from the normal operation and administration of the immigration laws." United States Department of Justice, Press Release (April 7, 1987) (announcing formation of Asylum Policy and Review Unit within the Department of Justice), *quoted in* Schmidt, *Refuge in the United States: The Sanctuary Movement Should Use the Legal System*, 15 Hofstra L.Rev. 79, 85 (1986).

Why, then, if congress intended to curtail the attorney general's authority over the asylum process, did it make asylum a discretionary remedy rather than a mandatory form of relief? The answer to this question becomes evident when we consider the drafting of the Refugee Act and the administrative practice since its enactment. The senate bill, as reported out of the Senate Judiciary Committee, originally made the grant of asylum mandatory upon an appropriate showing of persecution. S.Rep. No. 96–256, 96th Cong., 2nd Sess. 8–9 (1979). The house version of the provision, the one ultimately adopted in the conference report, vested the attorney general with the discretionary authority he now possesses. The house report emphasized, however, that "[t]he Committee wishes to insure a fair and workable asylum policy which is consistent with this country's tradition of welcoming the oppressed of other nations and with our obligations under international law. * * * The Committee intends to monitor closely the Attorney General's implementation of the section so as to insure the rights of those it seeks to protect". H.R.Rep. No. 96–608, 96th Cong., 2nd Sess. 17–18 (1979); *see generally* Anker & Posner, *supra*, at 43–64.

Although there is some ambiguity here, it is apparent that congress did not intend to give the attorney general boundless "discretion" to make asylum decisions, for that would surely have frustrated the primary goals of the Refugee Act. Instead, as the house report suggests, congress merely desired to preserve some degree of flexibility in the administration of the asylum process in the context of a larger refugee program that involves, among other things, procedures for the admission of applicants at American offices overseas. In view of the inherent problems of running such a large and complex program, it is conceivable that a person who might otherwise qualify for asylum should be denied relief because, for example, he had a previous offer to settle in a nonthreatening third county, or had intentionally circumvented the admissions process available in his home country in order to achieve more immediate entry into the United States.

A decade of practice confirms that the board's discretionary denials of asylum to otherwise eligible candidates have been primarily for reasons of administrative fairness and efficiency, not to preserve our political relationship with the allegedly persecuting nation. Two types of cases have been the primary subjects of such denials. The first involves situations in which applicants have abused the asylum process by fraudulently circumventing the overseas admissions process without sufficient cause. *See Sarkis v. Sava*, 599 F.Supp. 724, 755 (E.D.N.Y.1984); *Matter of Gharadaghi*, Interim Dec. No. 3001 (BIA Nov. 1, 1985); *Matter of Shirdel*, Interim Dec. No. 2958 (BIA Feb. 21, 1984); *Matter of Salim*, 18 I. & N. Dec. 311 (BIA 1982). Even here, however, the board has emphasized that abusing the admissions process "is only

one of a number of factors which should be balanced in exercising discretion, and the weight accorded to this factor may vary depending on the facts of a particular case. * * * [T]he danger of persecution should generally outweigh all but the most egregious of adverse factors." *Matter of Pula*, Interim Dec. No. 3033 (BIA Sept. 22, 1987). The second type of discretionary denial involves refugees who have found a safe haven in another country before entering the United States. *See* Helton, *supra*, at 1007 & n. 49 (citing unpublished BIA decisions).

In summary, the history of the Refugee Act, its purpose, and the context within which it was enacted, all show that congress intended the attorney general to exercise a more limited role in asylum cases as compared with his role in other types of discretionary immigration matters. As demonstrated by the administrative practice before the board, this limited discretion has not been used to implement the government's foreign policy objectives, something that would clearly violate the spirit, if not the letter, of the Refugee Act, but rather to deter abuses of the refugee system, and to deny relief to aliens who have found safety elsewhere.

Reviewing Attorney General Thornburgh's decision in light of the above, we conclude that he based his decision in large part on the types of geopolitical concerns that congress intended to eliminate from asylum cases. The attorney general held that he would deny asylum for the following reasons:

> First, it is "the policy of the United States that those who commit acts of violence against a democratic state should receive prompt and lawful punishment." * * * Deporting respondent to the United Kingdom would unquestionably advance this important policy. * * * Second, the United States Government, through the State Department, has specifically determined that it is in the foreign policy interests of this country that respondent be deported to the United Kingdom. * * * Third, respondent knowingly and intentionally waived his claim to asylum, and for the reasons explained in Part IV, *supra*, I would not permit withdrawal of that waiver. Fourth, I believe that respondent's membership in and assistance of the PIRA in its acts of persecution, and the nature and number of his criminal acts in general * * * suggest that he is not deserving of equitable relief.

Decision of Attorney General Thornburgh at 28 (June 30, 1989) (citations omitted).

The first two reasons given by Attorney General Thornburgh simply restate the foreign policy concerns identified by Attorney General Meese when he barred Doherty's return to the Republic of Ireland. While such considerations were clearly relevant in that context, as indicated by the statutory standard of "prejudicial to the interests of the United States", INA § 243(a), 8 U.S.C. § 1253(a), congress did not intend the same factors to influence asylum decisions. In giving effect to these considerations, the attorney general seriously exceeded his discretion. The attorney general's third rationale, that Doherty "waived" his claim to asylum, is also improper, for the reasons explained below in part B.5 of this opinion. As for the attorney general's final reason, it not only assumes facts that would be more properly determined at a hearing, it also depends in large measure on Doherty's "membership" in the PIRA, one of the very bases for which he claims persecution. In short, Attorney General Thornburgh exercised his discretion in denying Doherty's application for reasons that congress sought to eliminate from asylum cases, and, in doing so, he abused his discretion.

### 5. *Waiver.*

Finally, as an independent ground for denying the motion to reopen, Attorney General Thornburgh ruled that Doherty had "waived" his right to apply for relief. According to the attorney general, when Doherty conceded deportability to the Republic of Ireland and withdrew his initial application for asylum in September 1986, he "assumed the risk" that the Republic of Ireland might change its extradition law and that his designation of the Republic of

Ireland might be rejected by Attorney General Meese. As Attorney General Thornburgh put it,

> [T]he integrity of the administrative process dictates that a deportee who, with the advice and assistance of counsel, makes such deliberate tactical decisions, not be permitted to disown those decisions merely because they ultimately result in action adverse to his interests. This is especially the case where the possibility of that action was not only foreseeable but foreseen.

The attorney general's reasoning. is incompatible with any motion to reopen, however. If parties to a deportation hearing were held to "assume the risk" that subsequent developments might change the basis for the board's decision, no case would ever be reopened. For example, an alien could not reopen a case to introduce new evidence that after a change in leadership he would be persecuted in a country that had previously appeared nonthreatening. He would have "assumed the risk" that such events might transpire.

Moreover, we find the government's professed concern for the "integrity of the administrative process" unconvincing in light of its own actions in this case. The government's use of administrative and judicial processes has been exhaustive, to say the least. Its efforts have included, in Judge Friendly's words, an extended attempt "to escape from the long held principle that when an extradition magistrate * * * refuses to certify a person sought to be extradited under an extradition treaty, the Government's sole recourse is to submit a request to another extradition magistrate." *United States v. Doherty*, 786 F.2d at 492–93. In addition, the government itself moved to reopen the case at an earlier stage of the administrative proceedings, even though its substantive motion was denied upon reopening. Finally, the certification procedure itself, a rarely used procedural device that is removed from normal administrative channels, has twice been invoked by the attorney general with respect to Doherty.

In short, it would be unfair to deny a motion to reopen for what amounts to a dubious procedural argument where the alien has otherwise satisfied the standards for reopening and where the government's own conduct in the case has demonstrated less-than-perfect adherence to procedural formalities. The "sporting theory of justice" has no place in deportation proceedings. *Matter of Martinez–Solis*, 14 I. & N. Dec. 93, 95 (BIA 1972).

## CONCLUSION

The order of former Attorney General Meese is affirmed insofar as it rejected Doherty's designation of the Republic of Ireland as the country to which he would be deported and ordered him deported directly to the United Kingdom. The order of Attorney General Thornburgh denying Doherty's motion to reopen is reversed and the case is remanded to the board for further proceedings consistent with this opinion.

LUMBARD, Circuit Judge, concurring in part and dissenting in part:

After seven years of proceedings before the immigration authorities, the Attorney General has decided that Doherty, who has admitted his deportability after illegal entry into the United States, may not reopen the matter and be heard on his claims for asylum as a political refugee and for withholding of deportation. The record supports the Attorney General's exercise of his discretion in denying further hearing. It also supports his decision that "[i]t is in the [United States'] interest that [Doherty] be sent directly to the United Kingdom," which he left as a fugitive from justice, and not to the Republic of Ireland. Consequently, I would affirm both orders of the Attorneys General.

On June 10, 1981, Doherty escaped from the Crumlin Road prison in Northern Ireland where he was being held during his trial for the killing of Captain Herbert Westmacott of the British Army on May 2, 1980. Two days after his escape, he was convicted for the murder and sentenced to life imprisonment. A fugitive from justice,

he entered the United States illegally on or about February 1, 1982 and was arrested in New York City on June 18, 1983. At about the same time that a deportation warrant was filed against him, Doherty filed for asylum and withholding of deportation on June 28, 1983.

Having been thwarted in returning Doherty to the United Kingdom under the extradition treaty then in force, by a ruling of the District Court for the Southern District in December 1984 which under long-standing caselaw was not appealable, the Government sought to expel him as an illegal immigrant and return him to the country from which he had fled.

In a strategic maneuver undertaken with advice of counsel, Doherty conceded deportability on September 5, 1986 and withdrew his applications for asylum and withholding of deportation. On September 12, 1986, the Immigration and Naturalization Service, which executes the immigration laws under the supervision of the Attorney General, requested the Immigration Judge ("IJ") to deport Doherty to the United Kingdom. Nonetheless, the IJ decided that Doherty should be returned to the Republic of Ireland. After the Board of Immigration Appeals ("Board" or "BIA") upheld the IJ, Attorney General Meese on June 9, 1988 decided in the best interests of the foreign relations of the United States that Doherty should be returned to the United Kingdom rather than to the Republic of Ireland.

Meanwhile, on December 3, 1987, Doherty moved for leave to reopen the deportation proceedings to reapply for asylum and withholding of deportation in view of what he claimed were changed circumstances. The Board, on November 14, 1988, voting 3–2, granted leave to reopen.

Attorney General Thornburgh on June 30, 1989 overruled the Board and denied leave to reopen. In a carefully reasoned opinion, he held that even if Doherty were permitted to reopen the deportation proceedings, he would be denied asylum—a form of discretionary relief—because his violent acts rendered him ineligible for a favorable exercise of discretion. This opinion demonstrates conclusively that Doherty has shown no new facts which are relevant to the Attorney General's decision to return him to the United Kingdom.

Doherty has enjoyed in full measure any right he has to a full and extended consideration of his claims. The Attorney General is the final authority on the return of illegal aliens. We should sustain his authority especially in matters which so intimately affect the foreign relations of the United States. The Attorney General's opinion shows that, whatever else may be done, the inevitable result is that Doherty will be sent back to the United Kingdom.

I

In *Doherty v. Meese*, 808 F.2d 938, 943–44 (2d Cir.1986),[1] we held that, in immigration cases with weighty foreign policy implications, a decision of the Attorney General is "essentially unreviewable" when Congress has committed that decision to the unguided discretion of the Attorney General. Judicial inquiry in such cases is effectively limited to claims of unconstitutionality, fraud, or lack of jurisdiction, *id.* at 944 (citations omitted), and this case presents no colorable claims of that nature. Thus, we held then that the decision whether to reject an alien's designation of the country to which he will be deported ("designation") under § 243(a) of the Immigration and Nationality Act ("Act" or "INA") is "essentially unreviewable" because the statute provides that such a decision is simply in the Attorney General's "discretion." 8 U.S.C. § 1253(a).

1. There, Doherty petitioned for habeas corpus relief from his detention pending the Government's administrative appeal of the IJ's decision granting Doherty's request to be deported to the Republic of Ireland rather than to the United Kingdom. Doherty contended that the Government's appeal was frivolous and was intended solely to keep him in the United States until after the effective date of the Supplementary Extradition Treaty between the United States and the United Kingdom. *See Doherty v. Meese,* 808 F.2d at 940. We affirmed the district court's denial of habeas relief because the Government clearly had a reasonable basis for pursuing the administrative appeal.

**1124**

We now review a decision denying a motion to reopen deportation proceedings. Like the matter of designation, motions to reopen are committed to the discretion of the Attorney General. In numerous cases, the Supreme Court has held that such motions are discretionary in the Board. *See, e.g., INS v. Rios–Pineda,* 471 U.S. 444, 449, 105 S.Ct. 2098, 2101–02, 85 L.Ed.2d 452 (1985); *INS v. Phinpathya,* 464 U.S. 183, 188 n. 6, 104 S.Ct. 584, 588 n. 6, 78 L.Ed.2d 401 (1984); *INS v. Jong Ha Wang,* 450 U.S. 139, 144 n. 5, 101 S.Ct. 1027, 1031 n. 5, 67 L.Ed.2d 123 (1981). Because the Board "is not a statutory body, but is wholly a creature of regulations issued by the Attorney General," *Greene v. INS,* 313 F.2d 148, 151 (9th Cir.) (citing 8 C.F.R. §§ 3.1 *et seq.*), *cert. denied,* 374 U.S. 828, 83 S.Ct. 1869, 10 L.Ed.2d 1051 (1963), the only source of the Board's discretion is the Attorney General. Furthermore, the Attorney General always has authority to review a decision of the Board, *see* 8 C.F.R. § 3.1(h)(1). Thus, because the Board has discretion in this area, the Attorney General *a fortiori* has discretion at least as broad.[2]

Since we affirm Attorney General Meese's discretionary rejection of Doherty's designation because it is "essentially unreviewable," and since Attorney General Thornburgh's discretionary decision not to reopen proceedings is likewise "essentially unreviewable," we should also affirm the Thornburgh order. We had no basis for reversing the Attorney General in *Doherty v. Meese,* and we have none now.

Motions to reopen "are disfavored in deportation proceedings" for the same reason that petitions for rehearing and motions for new trials based on newly discovered evidence are disfavored: "There is a strong public interest in bringing litigation to a close as promptly as is consistent with the interest in giving the adversaries a fair opportunity to develop and present their respective cases." *INS v. Abudu,* 485 U.S.

94, 107, 108 S.Ct. 904, 913, 99 L.Ed.2d 90 (1988). Doherty has had seven years to develop and present his case yet he has failed to convince the Attorney General. When the Attorney General decides, after a careful review of the voluminous record, that a drawn-out case such as this no longer merits attention, we are in no position to contradict that judgment.

There is a special reason for judicial restraint in cases such as this. As compared with officials of other administrative agencies, "INS officials must exercise especially sensitive political functions that implicate questions of foreign relations, and therefore the reasons for giving deference to agency decisions on petitions for reopening or reconsideration in other administrative contexts apply with even greater force in the INS context." *Abudu,* 485 U.S. at 110, 108 S.Ct. at 914–15 (footnote omitted). There can be no doubt that political judgments are at the heart of the decision not to reopen this case. As we stated in *Doherty v. Meese,* the Doherty matter "affects not only the relations of the United States with the United Kingdom and the Republic of Ireland, but also the complicated multilateral negotiations concerning efforts to halt international terrorism." 808 F.2d at 943. To prolong these proceedings after the Attorney General has drawn the line is to upset a policy decision that affects international relations and that accordingly should be " 'largely immune from judicial inquiry or interference,' " *id.* (quoting *Harisiades v. Shaughnessy,* 342 U.S. 580, 589, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952)).

The denial of Doherty's motion to reopen was made not by an inferior INS official but by the Attorney General himself in a thorough and reasoned signed opinion. The Attorney General, as a member of the Cabinet who reports to the President and is conversant with the views of the administration, expresses the views of the Government. When the Attorney General makes

---

**2.** The Attorney General's discretionary authority to decide or even to countenance motions to reopen derives from those portions of the Act providing that "[t]he Attorney General shall be charged with the administration and enforcement of" the Act and "shall ... perform such

other acts as he deems necessary for carrying out his authority under the provisions of" the Act. INA § 103(a), 8 U.S.C. § 1103(a). This language places no constraints on the decision-making authority that it confers upon the Attorney General.

a judgment on an essentially political question, we usurp the executive's authority when we review that decision for infirmities less grave than the most serious violations of law. *See Doherty v. Meese*, 808 F.2d at 944.

The majority states that the Board has "developed a well of informed experience" concerning motions to reopen and that "it is precisely the knowledge gained through such experience that gives us reason to defer to the Board's decisions in most immigration matters." Thus, the majority implicitly concludes, the Board's decision here deserves more deference than Attorney General Thornburgh's decision disapproving it. I cannot accept this conclusion. Matters which concern asylum and deportation are primarily matters of foreign policy and political judgment. The Attorney General has the ultimate authority in such matters, not the members of an inferior Board. Congress has placed the Attorney General at the top of the hierarchy of immigration officials; his word is the last word.

*INS v. Abudu*, 485 U.S. 94, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988), should not be the sole focus of our inquiry because it addresses few of the foregoing concerns. In large part, *Abudu* simply summarized prior holdings regarding some of the grounds upon which the Board may deny a motion to reopen and held that the Board's denial of a motion to reopen under 8 C.F.R. § 3.2 or 208.11 should be reviewed under an abuse-of-discretion standard. Since *Abudu* involved a decision of the Board and not of the Attorney General himself, it provides little guidance for our review of the extraordinary case where, as here, the Attorney General has deemed certain principles and policies—for example, that those who use violence to advance parochial ends are not to benefit from the privileges offered by our immigration law—so important that he has used his rarely exercised authority under 8 C.F.R. § 3.1(h)(1) to articulate and apply them. By dwelling on the reasons set forth in *Abudu* for denying a motion to reopen, the majority gives insufficient attention to the unusual posture of this case. Moreover, *Abudu* is not the last word on motions to reopen because the *Abudu* list

of reasons for denying a motion to reopen was clearly not meant to be exhaustive. *See* 485 U.S. at 104, 108 S.Ct. at 911 ("There are *at least* three independent grounds on which the BIA may deny a motion to reopen.") (emphasis added).

## II

Even under *Abudu*, the motion to reopen was properly denied for three reasons.

First, to the extent that the motion to reopen was for the purpose of applying for asylum, it was properly denied under the third *Abudu* factor, which provides that where a party moves to reopen to apply for discretionary relief, such as asylum,

the BIA may leap ahead, as it were, over the two threshold concerns (prima facie case and new evidence/reasonable explanation), and simply determine that even if they were met, the movant would not be entitled to the discretionary grant of relief.

*Abudu*, 485 U.S. at 105, 108 S.Ct. at 912.

If the BIA may simply deny the motion because it believes the movant is undeserving of asylum, then surely the Attorney General may do the same. Here, Attorney General Thornburgh did just that with the following statement:

In my discretion, I would not grant [Doherty] asylum. [I]t is the "policy of the United States that those who commit acts of violence against a democratic state should receive prompt and lawful punishment." *Matter of Doherty*, Mem. Att'y Gen. at 7 (June 9, 1988). Deporting [Doherty] to the United Kingdom would unquestionably advance this important policy. *See id.* at 6–7. [In addition,] the United States Government, through the State Department, has specifically determined that it is in the foreign policy interests of this country that respondent be deported to the United Kingdom. *Id.* at 7–8.

In so ruling, the Attorney General did not abuse his discretion.

The majority, disregarding the delicacy of this determination, notes that Attorney General Thornburgh, in ruling that Doher-

ty ultimately would not be granted asylum, referred to the nation's political and foreign policy interests. According to the majority, such a reference was an abuse of discretion because the legislative history of the asylum provision supposedly indicates that Congress intended such interests to be ignored in the determination of whether to grant an asylum application. My reading of the legislative history, even accepting the majority's historiography, leads me to a different conclusion. Even if the asylum provision does define eligibility for asylum, it explicitly commits the asylum determination to the discretion of the Attorney General. Congress specifically rejected making asylum mandatory upon the appropriate showing. If Congress had wanted to limit the Attorney General's discretion to deny an asylum application, it knew how to do so. That the statute places no restrictions on his discretion tells us that Congress intended that there be none.

Moreover, a comparison of the two provisions indicates that the Attorney General has no less discretion in deciding asylum cases then he does in deciding where to deport an alien. The deportation provision states:

> "The deportation of an alien ... shall be directed by the Attorney General to a country promptly designated by the alien ... unless the Attorney General, *in his discretion*, concludes that deportation to such country would be prejudicial to the interests of the United States."

INA § 243(a), 8 U.S.C. § 1253(a) (emphasis added). Similarly, the asylum provision states:

> [T]he alien may be granted asylum *in the discretion of the Attorney General* if the Attorney General determines that

such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title. INA § 208(a), 8 U.S.C. § 1158(a) (emphasis added). To judge from these two subsections, the Attorney General has wider latitude to reject an asylum application than a deportation designation because the asylum applicant may not even be considered for discretionary approval unless the Attorney General also determines that the applicant is a refugee. Thus, as I have shown with respect to the Attorney General's discretion to deny a motion to reopen, if a discretionary decision under the deportation provision is essentially unreviewable, then a discretionary decision under the asylum provision should also be essentially unreviewable.

There is no basis in the statute for concluding that, once an alien is determined to be eligible for asylum, the Attorney General's discretion to deny asylum is limited to a narrow class of cases involving administrative irregularity.[3] While Congress has established rules for determining who is eligible for asylum, it has created no rules for determining who among those eligible for asylum should receive that relief. The statute, in providing that "[t]he alien may be granted asylum *in the discretion of the Attorney General*," INA § 208(a), 8 U.S.C. § 1158(a) (emphasis added), uses the broadest language possible to describe the authority of the Attorney General to make the ultimate asylum decision. Moreover, if, as the majority states, those eligible for asylum "should ordinarily be granted asylum," then the statute's provision that the ultimate asylum decision is "in the discretion of the Attorney General" would be surplusage; such a view would render meaningless this most significant portion of the statute when a much more plausible interpretation—that Congress declined to

---

**3.** Doherty even fits into this category. The majority concedes that an asylum application may be denied when the applicant "intentionally circumvents the admissions process" in his home country to secure more speedy entry into the United States. This is essentially to say that an applicant's manipulation of the process for personal benefit is grounds for rejection. Here, Attorney General Thornburgh implicitly decided that by withdrawing his application for asylum, conceding deportability, and then renewing the application when his plan backfired, Doherty was seeking to manipulate the process in a way that made him undeserving of asylum. Certainly the Attorney General may decide, first, that Doherty's rejection of asylum in a tactical maneuver and his subsequent renewal of his asylum application represent an attempt to have it both ways and, second, that the Government need not grant asylum to one who plays fast and loose with so great a privilege as asylum in the United States.

guide the Attorney General's decision as to who among those eligible should receive asylum—is available.

Second, again to the extent that the motion to reopen was for the purpose of applying for asylum, it was properly denied under that part of the second *Abudu* factor which permits denial of a motion to reopen "in an asylum application case [if] the movant has not reasonably explained his failure to apply for asylum initially." 485 U.S. at 105, 108 S.Ct. at 911. In deciding, properly, that Doherty waived his claim to asylum as a result of a tactical choice, Attorney General Thornburgh effectively ruled that Doherty failed this prong of *Abudu*.[4] Doherty's decision to withdraw his asylum application, which is the equivalent of a "failure to apply for asylum initially," was made with advice of counsel and with full knowledge that the Government was going to contest his designation and that the statute authorized Attorney General Meese to reject it.[5] It was a calculated risk on his part to admit deportability and not to pursue relief: his strategy was to be deported before the effective date of the Supplementary Treaty. Doherty asked to be deported knowing full well that such a procedural ploy might work to his disadvantage. Now that it has in fact worked to his disadvantage, he asks this court for a second bite at the apple for the obvious reason that he does not like the way his first plan worked out. Surely his miscalculation is not sufficient explanation of his failure to apply for asylum initially.

Attorney General Thornburgh points out that Doherty, having conceded deportability and failed to pursue an application for asylum or withholding, is in a position analogous to that of a defendant seeking to withdraw a guilty plea. One in such a position bears an extremely heavy burden of proof on a narrow issue: "[W]hen the judgment of conviction upon a guilty plea has become final and the offender seeks to reopen the proceeding, the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary." *United States v. Broce*, 488 U.S. 563, 109 S.Ct. 757, 762, 102 L.Ed.2d 927 (1989). Doherty makes no claim that his decision not to pursue asylum was either uncounseled or involuntary. Moreover, "[a] defendant is not entitled to withdraw his plea [of guilt] merely because he discovers long after the plea has been accepted that his calculus misapprehended the quality of the State's case or the likely penalties attached to alternative courses of action." *Brady v. United States*, 397 U.S. 742, 757, 90 S.Ct. 1463, 1473, 25 L.Ed.2d 747 (1970). That Doherty misapprehended the relative merits of the various options open to him, which is what his claims boil down to, is simply a statement that he failed to apply for asylum and not a reasonable explanation for that failure.

The majority miscasts Attorney General Thornburgh's waiver argument as a claim that a party to a deportation proceeding assumes the risk "that subsequent developments might change the basis for the Board's decision." Attorney General Thornburgh did not make so nebulous and sweeping a claim. He spoke only of those subsequent developments—Attorney General Meese's rejection of his designation and his potential extradition from the Republic of Ireland to the United Kingdom—which Doherty knew or should have known had a strong likelihood of coming to pass and for which Doherty's mere distaste is insufficient reason to excuse his unsuccessful stratagem.

Third, the entire motion to reopen was properly denied under that part of the sec-

---

**4.** Although Attorney General Thornburgh termed this waiver argument an "independent" ground for decision, it is the equivalent of a challenge, under the second *Abudu* factor, to the reasonableness of Doherty's explanation of his failure to apply for asylum initially.

**5.** He must be charged with knowing that there was a substantial risk Attorney General Meese would reject his designation. The same sen-

tence of the INA that gives the alien the right to designate gives the Attorney General the right to reject the designation. In addition, the Government's position stated in open court on September 12, 1986, when Doherty conceded deportability and designated the Republic of Ireland, and maintained ever since is that it would contest Doherty's designation.

ond *Abudu* factor which permits denial of a motion to reopen if "the movant has not introduced previously unavailable, material evidence." 485 U.S. at 104, 108 S.Ct. at 911 (citation omitted). The record fully supports Attorney General Thornburgh's decision that Doherty did not offer any previously unavailable, material evidence. The decision of Attorney General Meese to reject Doherty's designation and to deport Doherty to the United Kingdom was simply not evidence. It was a legal consequence. Doherty's argument here is akin to that of one who moves to withdraw a guilty plea because the sentence, or even prison itself, has proved harsher than expected. Such withdrawal is impermissible. *See United States v. Prince*, 533 F.2d 205 (5th Cir. 1976) (defendant may not withdraw plea of *nolo contendere*, made after consulting counsel, when sentence proved harsher than expected). As Attorney General Thornburgh stated, "The ultimate decision in an administrative process cannot itself constitute 'new' evidence to justify reopening. If an adverse decision were sufficient, there could never be finality in the process."

Nor did implementation of the Extradition Act on December 1, 1987 constitute new evidence. Attorney General Thornburgh found that Doherty was extraditable from the Republic of Ireland to the United Kingdom even prior to December 1, 1987 on the basis of long-standing provisions of Irish law, and I see no reason to disturb this finding. The Extradition Act is simply cumulative evidence—if it is evidence at all—of his extraditability to the United Kingdom. As Attorney General Thornburgh noted, one of Doherty's arguments in support of the immigration judge's decision to deport him to the Republic of Ireland was that Irish law prior to the Extradition Act also provided for his extradition to the United Kingdom. Thus, the fact of his extraditability from the Republic of Ireland to the United Kingdom did not newly arise on December 1, 1987 but rather existed long before that date.

I also agree with the Attorney General that the additional documents, books, and affidavit in support of his motion to reopen were either cumulative, previously available, or immaterial. As the Attorney General stated, "None of the evidence supports the existence of a threat of persecution of which respondent was unaware or a material change in the character of a threat previously recognized."

### III

To the extent the motion to reopen was for the purpose of applying for withholding of deportation, it was properly denied for two additional reasons.

In ruling that Doherty waived any claim he may have had to asylum, Attorney General Thornburgh also ruled that Doherty waived whatever claim he had to withholding of deportation. For the reasons stated above in Part II, this was a sufficient independent ground for his denial of the motion to reopen.

The motion to reopen was also properly denied under INA § 243(h)(2)(C), 8 U.S.C. § 1253(h)(2)(C), which provides that an alien "shall not" be granted withholding

if the Attorney General determines that—

. . . . .

(C) there are serious reasons for considering that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States....

As is evident from the face of the statute, the majority's statement that "withholding of deportation is mandatory upon a showing of statutory eligibility" tells only half the story. In fact, it is mandatory for the Attorney General to *deny* withholding if he determines that the alien fails any of the tests in § 243(h)(2)(A)–(D). Although the Attorney General's determination is not discretionary, § 243(h)(2) states numerous reasons to deny withholding, and subsection (C) has a low burden of proof, *see McMullen v. INS*, 788 F.2d 591, 599 (9th Cir.1986) (only "probable cause" required). Thus, I believe that as long as the record is adequate and the Attorney General makes reasoned findings based on that record, his

determination that the alien has failed any of the tests of § 243(h)(2), particularly that in subsection (C), should be a sufficient ground to deny a motion to reopen for the purpose of applying for withholding. Since the record is replete with Doherty's admissions of actions constituting violations of § 243(h)(2), and since the Attorney General's determination that Doherty failed the test in subsection (C) is a model of a reasoned decision based on the record, I think he properly denied the motion to reopen to the extent it was for the purpose of applying for withholding.[6]

Doherty admitted to all of the following at his 1984 extradition hearing. He was an officer in the Provisional Irish Republican Army ("PIRA") and committed acts dangerous to others on behalf of the PIRA,[7] which the United States Department of State has classified as a terrorist organization, *see* n. 6, *supra.* For example, in 1973, Doherty was convicted of and imprisoned for a firearms violation. In 1974, he was convicted of and imprisoned for smuggling 80 pounds of explosives in a car hijacked by the PIRA. In 1980, in a van hijacked by the PIRA, he drove several of his PIRA

confederates to a private Belfast house, while the van driver was held captive; took over the house and held hostage the family inside; and engaged in a firefight that resulted in the death of Captain Westmacott of the British Army.

As noted in the opinion dissenting from the Board's decision, "it is fortuitous that the civilian hostages [taken by Doherty and his associates] were uninjured in view of the fact that they were exposed to a gun battle." *Matter of Doherty*, No. A26 185 231, slip op. at 4 (BIA Nov. 14, 1988) (Morris, B.M., dissenting). Even if violence against a democratic government or against such a government's military personnel were a "political" rather than a "criminal" matter, which it surely is not, Doherty's participation in attacks against civilians has given Attorney General Thornburgh a substantial basis for concluding that Doherty has committed serious nonpolitical crimes outside the United States prior to his illegal entry.[8]

Given Doherty's admission of PIRA membership, of involvement in the Westmacott killing, and of offenses against in-

---

6. Although Attorney General Thornburgh found that Doherty failed the test in subsection (A) as well, I focus on his decision under (C), as the facts relevant to that subsection are particularly compelling. However, I find his conclusion under (A) perfectly acceptable as well. Subsection (A) prohibits the Attorney General from granting withholding to any alien he determines to have "ordered, incited, assisted, *or otherwise participated in* the persecution of any person on account of ... political opinion." § 243(h)(2)(A), 8 U.S.C. § 1253(h)(2)(A) (emphasis added). Doherty does not dispute that the official position of the United States is that the PIRA is a terrorist organization, *see* U.S. Department of State, *Patterns of Global Terrorism: 1988,* 33–34, 74–75 (1989); *McMullen,* 788 F.2d at 597, and the Board itself has found that the PIRA aims its violence at, among others, civilians who oppose the PIRA's objectives and methods. *See id.* at 600 ("The BIA found that the PIRA killed or attempted to kill those who publicly opposed their activities," and an active role in the PIRA "amounts to the assistance of this persecution on account of political opinion") (Goodwin, J., specially concurring). Because Doherty has admitted an active role in the PIRA and has embraced the PIRA without reservation, the Attorney General properly concluded that Doherty "otherwise participated" in persecution on account of political opinion.

7. The PIRA, a radical offshoot of the IRA, "formed in protest to the perceived inefficacy of the IRA," *McMullen v. INS,* 658 F.2d 1312, 1315 (9th Cir.1981), which itself used violence to achieve its ends, *id.* Apparently, the founding members of the PIRA believed that the IRA was not violent enough.

8. The decision denying Doherty's extradition on the ground that his murder of Captain Westmacott was a "political" offense, *Matter of Doherty by Gov. of United Kingdom,* 599 F.Supp. 270 (S.D.N.Y.1984), has no precedential value either for the Attorney General or for us. Offenses considered "political" for the purposes of extradition treaties may be considered "nonpolitical" for the purposes of the INA in general and of § 243(h)(2)(C), 8 U.S.C. § 1253(h)(2)(C), in particular. *See McMullen v. INS,* 788 F.2d at 596. In addition, "extradition determinations have no res judicata effect in subsequent judicial proceedings." *Id.* at 597 (citations omitted). Finally, that decision was not appealable under longstanding caselaw, *see United States v. Doherty,* 786 F.2d 491, 495 (2d Cir.1986); *Matter of Mackin,* 668 F.2d 122, 125–30 (2d Cir.1981), and we have therefore had no occasion for direct review of it on the merits.

nocent civilians; the low standard of proof under subsection (C); and the statutory imperative of denying withholding to one considered undesirable under § 243(h)(2), I believe that Attorney General Thornburgh's decision is unassailable. I fail to see what proper purpose will be served by granting a hearing on Doherty's withholding claim.

The majority, citing *Abudu*, states that "the attorney general's power to deny a motion to reopen based on factors other than the movant's failure to establish a prima facie case or the lack of new evidence is limited to 'cases in which the ultimate grant of relief is discretionary * * * *not withholding of deportation*'. [485 U.S. at 105, 108 S.Ct. at 912]" (emphasis added by majority). Thus, the majority implies, Attorney General Thornburgh erred by resolving this question as if withholding were a discretionary matter. I disagree.

Attorney General Thornburgh resolved Doherty's entitlement to withholding not as a discretionary matter but rather as a legal question governed by the rules set out in § 243(h)(2). Even if *Abudu* were the sole guide for our review, his decision regarding withholding would not be reviewable under the third *Abudu* factor. The real issue is the adequacy of the record and the rationality of the Attorney General's conclusion based on the record. Since the record and reasoning here were more than adequate, a further hearing would be a waste of time and would serve only to delay the final resolution of proceedings which have lasted seven years since Doherty's arrest in 1983.

### IV

For the foregoing reasons, I would dismiss both petitions for review and affirm the orders of the Attorneys General.