**HAITIAN CENTERS COUNCIL, INC.,** National Coalition for Haitian Refugees, Inc., Immigration Law Clinic of The Jerome N. Frank Legal Organization of New Haven, Connecticut; Dr. Frantz Guerrier, Milot Baptiste, Kennedy Agustin, and Yolande Jean, on behalf of themselves and all others similarly situated; Lener Miclis and Claud Kenol, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Chris SALE, Acting Commissioner, Immigration and Naturalization Service; Janet Reno, Attorney General; Immigration and Naturalization Service; Warren Christopher, Secretary of State; Rear Admiral Robert Kramek and Admiral Kime, Commandants, United States Coast Guard; and Commander, U.S. Naval Base, Guantanamo Bay, Defendants.

No. 92 CV 1258 (SJ).

United States District Court, E.D. New York.

June 8, 1993.

---

1030

Michael Ratner, Suzanne Shende, Center for Constitutional Rights, New York City, Lucas Guttentag, Judy Rabinovitz, American Civ. Liberties Union, Immigrants' Rights Project, New York City, Robert Rubin, Ignatius Bau, National Refugee Rights Project, Lawyers' Committee for Civil Rights of the San Francisco Bay Area, San Francisco, CA, Joseph F. Tringali, Susan Sawyer, Simpson Thacher & Bartlett, New York City, Harold Hongju Koh, Lowenstein Intern. Human Rights Clinic, New Haven, CT, for plaintiffs.

Stuart Schiffer, Acting Asst. Atty. Gen., Civ. Div., Robert Bombaugh, Director of Immigration Litigation, Lauri Steven Filppu, Office of Immigration Litigation, David J. Kline, Charles Pazar, Ellen Sue Shapiro, Office of Immigration Litigation, Dept. of Justice, Washington, DC, Zachary Carter, U.S. Atty., Brooklyn, NY, Scott Dunn, Sp. Asst., U.S. Atty., Robert Begleiter, Asst. U.S. Atty., for defendants.

### MEMORANDUM AND ORDER

JOHNSON, District Judge.

### INTRODUCTION

*The Parties*

The Plaintiffs are the Haitian Centers Council, Inc., National Coalition for Haitian Refugees, Inc., Immigration Law Clinic of the Jerome N. Frank Legal Organization of New Haven Connecticut (hereinafter "Haitian Service Organizations"); Dr. Frantz Guerrier, Milot Baptiste, Kennedy Agustin, and Yolande Jean (hereinafter "Screened In Plaintiffs" or "Haitian detainees"); and Lener Miclis and Claud Kenol (hereinafter "Immediate Relative Plaintiffs"). The Defendants are Chris Sale, Acting Commissioner, Immigration and Naturalization Services; Janet Reno, Attorney General; Immigration and Naturalization Service; Warren Christopher, Secretary of State; Rear Admiral Robert Kramek and Admiral Kime, Commandants, United States Coast Guard; and Commander, U.S. Naval Base, Guantanamo Bay (collectively the "Government").

*Prior Proceedings*

In March 1992, Plaintiffs commenced this class action seeking declaratory and injunctive relief arising from the Government's actions against Haitian detainees and Haitian Service Organizations following the military coup that overthrew the government of Jean–Bertrand Aristide on September 30, 1991. The Original Complaint alleged *inter alia* that the Government had violated the Haitian Service Organization's First Amendment right of access to their clients on Guantanamo, the Haitian detainees' statutory and constitutional due process right to counsel, the Administrative Procedure Act ("APA") and various international treaties, bilateral agreements and executive orders. The Court issued a temporary restraining order ("TRO") on March 27, 1992 enjoining the Defendants' conduct.

Five days later the Court held a hearing on Plaintiffs' application for a preliminary injunction. On April 6, 1992, the Court issued a preliminary injunction after finding that the Plaintiffs had made a showing of irreparable harm and a likelihood of success on the merits. The court specifically concluded that: 1) the Government's denial of access to the Haitian Service Organization appeared to be a content based restriction on speech; 2) the statutory right to counsel

under 8 U.S.C. § 1362 and 8 C.F.R. § 208.9 did not extend to the Haitian aliens beings detained on Guantanamo; and 3) the Screened In Plaintiffs [1] were entitled to the protection of the Fifth Amendment. In addition, the Court ruled that the Screened Out Plaintiffs [2] represented by Iris Vilnor were bound by the outcome of *Haitian Refugee Center, Inc. v. Baker.* [3]

The Government filed an appeal from this Court's April 15, 1992 order clarifying the relief granted in its April 6, 1992 Memorandum and Order on April 18, 1992. Four days later the Supreme Court granted the Government's application for a stay of this order pending the Second Circuit's disposition of the appeal. On June 10, 1992, the Second Circuit affirmed and modified this Court's April 6th preliminary injunction in *Haitian Centers Council, Inc. v. McNary,* 969 F.2d 1326 (2d Cir.1992). Without addressing the First Amendment claim of the Haitian Service Organizations, the Court of Appeals agreed that there were serious questions going to the merits of the Screened In Plaintiffs' Fifth Amendment claims.

While awaiting a decision from the Second Circuit on the appeal from the first injunction, the Government substantially altered its policy toward Haitian refugees fleeing the political upheaval in Haiti. On May 24, 1992, the President issued an Executive Order ("Kennebunkport Order") directing the United States Coast Guard to return any Haitian interdicted beyond the territorial waters of the United States directly to Haiti without being afforded the opportunity to undergo INS refugee screening. Plaintiffs quickly moved by Order to Show Cause for a TRO pursuant to Fed.R.Civ.P. 65 restraining the Government from acting pursuant to the May 24th Executive Order.

At a hearing on May 29, 1992, the Plaintiffs argued that the new policy violated Section 243(h) of the INA, Article 33 of the United Nations Convention relating to the Status of Refugees and the 1981 U.S.–Haiti Executive Agreement. On June 6, 1992, the court denied Plaintiffs' application for a preliminary injunction. The Plaintiffs immediately appealed to the Second Circuit Court of Appeals. On July 29, 1992, the Court of Appeals reversed this Court's June 6th order denying a preliminary injunction finding that the language of § 243(h) of the INA imposes a mandatory duty upon the United States not to return aliens to their persecutors, no matter where in the world those actions are taken. *Haitian Centers Council, Inc. et al. v. McNary,* 969 F.2d 1350 (2d Cir.1992). This Court immediately issued an injunction pursuant to the Second Circuit mandate. On August 1, 1992, the Supreme Court granted the Government's application for a stay pending filing of a petition of a writ of certiorari. The Supreme Court granted the Government's petition seeking certiorari in *McNary v. Haitian Centers Council, Inc.,* —— U.S. ——, 113 S.Ct. 52, 121 L.Ed.2d 22 (1992), and recently heard oral argument on this question.

*Trial on Guantanamo Case*

In September 1992, the parties appeared at a pre-trial conference.. The Plaintiffs made an oral application for a bifurcated trial pursuant to Rule 42(b). The Court granted the Plaintiffs' motion concluding that bifurcation of the Guantanamo case and the Executive Order case was appropriate in light of the fact that the Supreme Court had granted the Government's petition for certiorari and was likely to dispose of the issue within the next few months. On the eve of trial, the Government made a motion *in limine* regarding claims not in the Original Complaint. Specifically, the Defendants asked the Court to preclude Plaintiffs from 1) presenting any evidence about camp conditions, 2) presenting evidence on medical issues raised by the detention of HIV+ Haitians at Guantanamo and 3) presenting evidence relating to an attack on the HIV ground for exclusion of aliens. After reviewing the Original Com-

---

1. Plaintiffs who have been found to have a credible fear of return.

2. Plaintiffs who have been found to have no credible fear of return.

3. 789 F.Supp. 1552 (S.D.Fla.1991), *rev'd by* 949 F.2d 1109 (11th Cir.1991) (*en banc*), *rehearing denied by* 954 F.2d 731 (11th Cir.1992), *cert. denied by* —— U.S. ——, 112 S.Ct. 1245, 117 L.Ed.2d 477 (1992).

plaint and the Contention Interrogatories submitted, the Court agreed with the Government that many of the Due Process Claims mentioned in the Contention Interrogatories were not contained in the Original Complaint. Rather than granting a continuance, the Court began taking testimony and granted the Plaintiffs leave to amend the Original Complaint under Rule 15(b).

The Court conducted a bench trial on March 8–12, 15–19, and 25, 1993. Plaintiffs filed an Amended Complaint stating the following causes of action: 1) denial of the Haitian Service Organizations' First Amendment rights to provide advocacy and counselling to their clients detained on Guantanamo; 2) denial of the Haitian detainees' First and Fifth Amendment constitutional rights to obtain and communicate with counsel; 3) denial of the Haitian detainees' constitutional due process right to adequate medical care, to be free of indefinite detention and arbitrary punishment; 4) failure of the Government to follow rulemaking procedures;[4] 5) arbitrary and capricious agency action not in accordance with the law; 6) judicial enforceability of the duty of non-refoulement; and 7) equal protection. At the close of trial, the parties submitted Proposed Findings of Fact and Conclusions of Law which have been adopted and incorporated in part in the Court's findings below.

## STATEMENT OF FACTS

In 1981, the United States commenced the Alien Migration Interdiction Operation ("AMIO"), formerly known as the Haitian Migrant Interdiction Operation. A cooperative agreement between the United States and Haiti dated September 23, 1981 ("Haiti–U.S. Agreement") allows the United States Coast Guard ("Coast Guard") to board Haitian-flagged vessels on the high seas in order to inquire into the condition and destination of the vessel and the status of those on board. While the Agreement explicitly pro-vides that the "United States does not intend to return to Haiti any Haitian migrants whom the United States authorities determine to qualify for refugee status," a vessel and its passengers were subject to return or repatriation to Haiti if the Coast Guard determined that a violation of United States or Haitian law had occurred. Between 1981 and 1991, the United States interdicted approximately 25,000 Haitians. The United States conducted refugee or asylum pre-screening aboard Coast Guard cutters for interdicted Haitians as well as for interdicted nationals of 39 other countries including the Dominican Republic, the Bahamas, Pakistan, Iran, India, Colombia, and Chile during that period.

On September 30, 1991, Jean Bertrand Aristide ("Aristide"), the first democratically elected president in Haiti's history, was overthrown in a military coup. Fearing political persecution, thousands of Haitians fled the country by crossing the border into the Dominican Republic or taking to the high seas. Within a month of the coup, a large number of overcrowded, unseaworthy boats began departing from Haiti and the United States Coast Guard began interdicting an increasing number of such vessels in international waters.

Prior to interdicting a vessel, the Coast Guard inquired about the vessel's destination. Except when effecting a rescue at sea, the Coast Guard would not remove the passengers or master of a Haitian boat unless it was determined that the vessel was bound for the United States. However, the Coast Guard made no effort to determine the intended destination of each passenger on a particular vessel. If the Coast Guard believed that the vessel was headed for the United States, the Coast Guard interdicted all passengers, even if the passengers were willing to go to locations other than the United States. Because of their lack of seaworthiness, most of the interdicted Haitian

---

4. In November 1992, the Court dismissed the rulemaking claim pursuant to Rule 12(b)(6). Plaintiffs moved for reargument under Local Rule 3(j). A motion for reargument may be granted "only where the court has overlooked matters or controlling decisions which might have materially influenced the earlier decision."

*Caleb & Co. v. E.I. DuPont de Nemours & Co.,* 624 F.Supp. 747, 748 (S.D.N.Y.1985). After reviewing the briefs submitted on this motion, the Court finds that the Plaintiffs failed to meet the standard for granting reargument and will issue a separate order denying the motion.

vessels, if not all, would not have made it to the United States. In fact, some of the Haitian vessels landed in Cuba, Jamaica and the Bahamas. When the Coast Guard detained a Haitian vessel, it boarded the vessel and required all passengers to disembark. After all of the passengers had complied, the Coast Guard destroyed the Haitian vessel. Interdicted Haitians were thus given no option but to be detained on the Coast Guard cutter and to be taken to whatever location the Coast Guard elected.

*Asylum Screening and Pre–Screening Procedures*

Following the coup, the United States temporarily suspended its repatriation program while the Immigration and Naturalization Service ("INS") consulted with the United States Department of State ("State Department") on the procedures for handling the Haitian refugees. While the INS awaited a decision from Washington, the Coast Guard cutters with Haitian refugees aboard circled in international waters. For health and safety reasons, the cutters docked at Guantanamo Bay Naval Base, Cuba ("Guantanamo") on or about November 13, 1991 and the Haitians disembarked. A few days later, the decision making authority for determining whether interdicted Haitians were screened in or screened out was delegated back to INS officers in the field.

On November 22, 1991, the Office of the Deputy Commissioner. of INS issued a memorandum stating that a "credible fear of return" standard was to be utilized in asylum pre-screening procedures. Under this "credible fear" standard, Haitians with only one or two "refugee-like" characteristics would be "screened in." and thus determined to be eligible for political asylum. Interdicted Haitians with no "refugee-like" characteristics would be "screened out," and thus determined to be ineligible for political asylum and subject to repatriation. The "credible fear of return" standard was designed to be far more generous than the "well-founded fear of return" standard generally applied to asylum seekers.

As the number of interdicted Haitians rose, the INS transferred their interviewing operations from the Coast Guard cutters to Guantanamo. The interviews were conducted by highly trained members of the INS asylum corps which included INS officers, immigration lawyers, and human rights monitors. No attorneys representing the refugees were present during the "credible fear of return" interviews. Since October 1991, the INS screened in 10,500 Haitians found to have a "credible fear of return" and transported them to the United States to apply for asylum. An additional 25,000 interdictees were returned to Haiti by the Coast Guard after undergoing INS prescreening. A very small number were accepted by third countries.

*Rescreening HIV+ Haitian Detainees*

Soon after the INS began its Guantanamo operation, the United States began to seek third countries in which the Haitians could be relocated. The State Department pursued this with various countries in the region. Two countries, Belize and Honduras, offered to provide limited assistance, but prior to accepting the Haitians, asked that they be tested for the HIV virus. The results of those tests disclosed the presence of the virus in a number of the Haitian detainees at Guantanamo leading the Government to conduct HIV testing for all screened-in Haitians. The Haitians are the only group of asylum seekers to be medically tested for HIV.

Prior to September 1991, all screened-in Haitian refugees were brought to the United States before to receiving medical screening. As Gene McNary, then INS Commissioner, in a memorandum dated May 30, 1991, entitled "Asylum Pre–Screening of Interdicted Aliens and Asylum Seekers in INS Custody": "[i]nterdicted asylum seekers identified at sea for transfer to the United States will be properly inspected and medically screened *upon arrival* into the United States."

Then in a memorandum dated February 29, 1992, Grover Joseph Rees, INS General Counsel, stated a new INS policy requiring second or "well-founded fear" interviews of screened in persons who tested positive for the Human Immunodeficiency Virus ("HIV"). He wrote, in pertinent part:

> [A]ny person "screened in" as a possible refugee who has been determined to have

**1036**

a communicable disease that is not curable should be given an interview to determine whether he or she is a refugee within the definition of INA § 101(a)(42). In the case of a Haitian national in Guantanamo, this definition requires a finding that the person is unable or unwilling to return to Haiti because of a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. This finding is identical to that required to grant asylum or refugee status. *the interview should therefore be identical in form and substance, or as nearly so as possible, to those conducted by asylum officers to determine whether asylum should be granted to an applicant already in the United States.*

By letter dated March 11, 1992, attorneys for the Haitian Service Organizations requested permission to communicate with the screened-in Haitians held on Guantanamo. The request was denied. The Screened In Plaintiffs detained on Guantanamo themselves repeatedly requested counsel. Their requests were also denied. The military did not oppose visits from counsel and when such visits have been permitted, the military has not found any disruption to the operation of the camp. Other groups, including the press, clergy, and non-U.S. contract workers (e.g., Cubans, Jamaicans and Filipinos) have been permitted access to Guantanamo. In the absence of attorneys, the Haitians have received legal advice from the military, INS, Community Relations Service representatives, ministers and even military doctors.

Notwithstanding the fact that attorneys are regularly present during nearly identical asylum interviews in the United States, the INS refused to permit the Screened In Plaintiffs to have counsel present at their "well-founded fear" interview. At trial, an INS official expressed the agency's concern with the presence of attorneys at asylum interviews saying that lawyers would only stress the positive element of an applicant's case and deemphasize the negative aspects. This Court finds that lawyers serve a necessary and useful purpose in representing an asylum seeker in connection with the well-founded fear of return interview. Their presence

at these interviews is also clearly feasible. The Government's decision to deny Plaintiff Haitian Service Organizations access to Camp Bulkeley is based solely on the content of what they had to say and the viewpoint they would express.

The second interviews, like the first interviews, were conducted in the absence of attorneys. Of the HIV+ Screened In Plaintiffs who underwent the second interview, 115 Haitians were found to have a well-founded fear of return. A number of HIV+ Haitians who had been screened in were repatriated to Haiti after having failed the second interview or having declined to undergo the second interview. Haitians who received an adverse determination did not have the opportunity to appeal the decision.

*Guantanamo Operation*

The United States Naval Base at Guantanamo Bay, Cuba, is subject to a lease agreement between the United States and Cuba which states that:

> during the period of occupation by the United States of said areas under the terms of this agreement the United States shall exercise complete jurisdiction and control over and within said areas.

The U.S. Naval Base at Guantanamo is a "relatively open base" to which non-military personnel such as military dependents, foreign nationals, contractor employees providing support services, and civilian government employees are allowed access. The facilities include schools, bars, restaurants, a McDonalds and a Baskin–Robbins.

When the first group of Haitians arrived in November 1991, the existing facilities at Guantanamo were not sufficient to provide housing for all interdictees. A special Joint Task Force ("JTF") comprised of several branches of the Armed Services, was sent to Guantanamo to provide temporary humanitarian assistance to the Haitians including housing, food, and medical care from military physicians. In order to house the Haitians, the JTF evicted U.S. military personnel from the cinder block quarters at Camp Bulkeley on the eastern edge of the base. Tents were also erected at Camp Bulkeley to temporarily house the several thousand migrants who

arrived at Guantanamo at the outset. When Camp Bulkeley's capacity proved inadequate, the JTF opened a new series of camps at the unused McCalla air field. These McCalla camps were all tent facilities except for the large hangar at the airfield.

Portable toilets were made available for use by the Haitians. Flush toilets were not provided because there were insufficient facilities at Guantanamo to treat the sewage. The portable toilets are pumped out by the military on a regular schedule, usually three times a week; military personnel also regularly disinfect the portable toilets though the Haitians themselves are responsible for keeping the inside of the toilet facilities clean. Later, latrines were built at Camp Bulkeley in order to alleviate sanitation problems caused by the portable toilets. The new latrines allowed the military to hose down the area and prevented the collection of trash and other waste.

At several times during the months between November 1991 and May 1992, the base reached its 12,500 migrant capacity.[5] This limit existed because of the base's infrastructure and its ability to provide adequate water, sanitation, and the other essentials to the combined populations of interdicted Haitians, military personnel, and civilian workers and dependents.

The camps at Guantanamo were organized around the INS interview process. Upon arrival, interdictees would received identification cards and bracelets. They would then be screened by the INS. Haitians who were "screened out" would be placed in a camp for those being repatriated to Haiti. Haitians who were "screened in" would be moved to another camp to await processing for transport to the United States.

In March 1992, after the prevalence of the HIV virus among the refugee population was ascertained, the JTF created a separate camp for them. Camp Bulkeley was chosen for that purpose. The then existing population of HIV negative Haitians at Camp

Bulkeley remained until they were processed and departed Guantanamo. As "screened in" HIV+ Haitians were identified, they were transferred to Camp Bulkeley, eventually making it predominantly an HIV+ facility. The camp also contained HIV negative relatives of the HIV+ Haitians.

Today there are approximately 200 "screened in" HIV+ Haitians remaining at Guantanamo. They live in camps surrounded by razor barbed wire. They tie plastic garbage bags to the sides of the building to keep the rain out. They sleep on cots and hang sheets to create some semblance of privacy. They are guarded by the military and are not permitted to leave the camp, except under military escort. The Haitian detainees have been subjected to pre-dawn military sweeps as they sleep by as many as 400 soldiers dressed in full riot gear. They are confined like prisoners and are subject to detention in the brig without a hearing for camp rule infractions. Although the Haitian detainees have a chapel, weight room, bicycle repair shop, beauty parlor and other amenities at their disposal, none of these things are currently available to them, as they are now confined to Camp Alpha, a small section of Camp Bulkeley, or to the brig.

*Medical Care at Guantanamo*

Medical care is provided through a Battalion Aid Station ("BAS", or clinic) at Camp Bulkeley and the Guantanamo Naval Hospital. The clinic is staffed by two physicians, a United States Navy doctor, Board certified in family practice, and a doctor who is a specialist in infectious disease. The infectious disease specialist is responsible for overseeing the drawing of blood for T-cell counts [6] of the migrants and counselling them regarding their T-cell counts, prescribing anti-retroviral drugs for HIV, and supervising the treatment of any other case of contagious illness, including tuberculosis or sexually transmitted diseases. The infectious disease specialist also supervised educational, counselling, and clinical care programs, and

5. Approximately 36,000 Haitian interdictees passed through the various camps at Guantanamo between November 1991 and July 1992.

6. According to Centers for Disease Control surveillance case definition, an HIV infected individual with T cell counts of 200 or below or percentages of 13 or below has full-blown AIDS.

was responsible for seeing patients daily regarding specific aspects of their HIV care.

The two physicians are assisted by a medical staff of four registered nurses, three independent duty corpsman, a family practice nurse practitioner, 20 general duty corpsmen, and a preventive medicine technician whose duties include spraying standing water against insects, and rodent control. The clinic is a cinderblock, air conditioned building with four examining rooms, a large waiting area, a laboratory, and a pharmacy. The clinic, open generally from 7:30 a.m. to 4:00 p.m. daily, has 11 beds, but its capacity is expandable to about 55.

The Haitians do not need an appointment to come to the clinic, however, they may make appointments to see physicians as needed. The clinic is staffed 24 hours a day, seven days a week either by general duty corpsmen or physicians. If the general corpsman needs further assistance, he or she contacts the independent duty corpsman. If the independent duty corpsman needs assistance, he or she contacts the physician on call. Physicians on call to the clinic at Camp Bulkeley wear beepers and can be, and often are, summoned at any time.

Medical specialists from the Naval Hospital, including an OB/GYN, psychiatrist, orthopedic surgeon, general surgeon, doctor of internal medicine, pediatrician, and three family practitioners are available to treat the Haitians. The physicians at Camp Bulkeley can, and do, admit patients to the hospital. The physicians at Camp Bulkeley have cared for all populations in the Haitian community at Guantanamo. Children have been fully immunized in compliance with United States standards. In addition, tuberculosis among the migrants has been vigorously treated with supervised drug therapy. Pregnant women among the migrants at Guantanamo have received care commensurate with what they would receive in the United States including ultrasound.

Despite the ability of military doctors and facilities to treat routine illnesses, the Government acknowledges that the medical facilities on the Guantanamo Naval Base are inadequate to provide medical care to those Haitians who have developed AIDS, particularly patients with T-cell counts of 200 or below or a percentage of 13 or less. The military doctors believe that the medical facilities on Guantanamo are inadequate to treat such AIDS patients, because there is neither a CT scanner nor a variety of specialists (such as ophthalmologists, neurologists, pulmonologists, nephrologists and oncologists) that are necessary to diagnose and treat those with AIDS. The military doctors first raised these concerns at least as early as May, 1992. The military has requested that certain HIV+ Haitians be medically evacuated from Guantanamo because the military does not believe it can provide adequate medical care to those patients on Guantanamo. Certain of these requests have been denied by the INS on more than one occasion.

At trial the Government did not offer any evidence which would prove the facilities at Guantanamo to be adequate. In fact, defendants' counsel admitted that "the medical facilities at Guantanamo are not presently sufficient to provide treatment for such AIDS patients under the medical care standard applicable within the United States itself." But when asked whether the Government was "prepared to send those [patients] to the United States for treatment," Defendants' counsel responded, "The government does not intend at this point to do that."

The INS offered no explanation for its repeated refusal to accept the recommendation of the military doctors and Camp Commanders in whom the INS has entrusted the care of the Screened In Plaintiffs. The Court was disturbed to hear the testimony of Duane "Duke" Austin, the INS Special Assistant to the Director of Congressional and Public Affairs, who reportedly remarked to the press with regard to the Haitians with AIDS held on Guantanamo, "they're going to die anyway, aren't they?" It is outrageous, callous and reprehensible that defendant INS finds no value in providing adequate medical care even when a patient's illness is fatal.

Although the defendants euphemistically refer to its Guantanamo operation as a "humanitarian camp," the facts disclose that it is nothing more than an HIV prison camp pre-

senting potential public health risks to the Haitians held there. There is no dispute that because HIV+ individuals are immuno-suppressed, they are more susceptible to a variety of infections, many of which can be transmitted from one person to the next. No major outbreak of infectious disease has occurred yet, but by segregating HIV+ individuals, the Government places the Haitian detainees at greater risk of contracting infections, including tuberculosis, measles and other life threatening diseases, than if they were permitted to live in the general population. Indeed, Dr. James Mason, then Assistant Secretary for Health, Department of Health and Human Services ("HHS"), wrote to Gene McNary, then INS Commissioner, on March 25, 1992, that HHS had "growing public health concerns" in connection with the operation of an HIV+ prison camp. As the Centers for Disease Control wrote: "the presence of a large number of HIV-infected individuals held for a long period of time in a camp environment is likely to result in significantly increased public health risks to the migrants and others in the camp." The military itself recognized in March 1992 that "[f]rom a medical standpoint we could have a serious medical problem if any type of infectious disease hits the camp. The major issue being that we could not provide them the adequate level of care required in this situation."

In addition, the prison camp environment created by the Government is not conducive to an effective doctor-patient relationship. Nevertheless, plaintiffs do not dispute that the military doctors have worked hard to serve the Haitians held there, but for a variety of reasons, the doctor-patient relationship has been frustrated. Despite the commendable efforts by the military doctors to serve the Haitian detainees, many of the Haitians held on Guantanamo do not trust the military doctors. Some Haitians believed that the military doctors were involved in their continued detention on Guantanamo. Cultural differences between the Haitians and the military doctors have also impaired communications.

The seriously impaired doctor-patient relationship makes it more difficult for defen-dants to provide adequate medical care at the camp. Even if Defendants continue to provide medical services, many of the Haitian detainees will grow increasingly sick because they do not trust their diagnosis or the medication prescribed for them.

## CONCLUSIONS OF LAW

I. *Class Certification*

█ A class action may be brought under Rule 23(a) if the class is so numerous that joinder of all members is impracticable, there are questions of law or fact common to all, the claims or defenses of the representative parties are typical of the claims or defenses of the class and the representative parties will fairly and adequately protect the interests of the class. In addition to the above prerequisites, an action may be maintained as a class action if the opposing party "has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding injunctive relief with respect to the class as a whole." Rule 23(b)(2).

The Complaint defines the Haitian class as "[a]ll Haitian citizens who have been or will be "screened-in"—including those who have been or may be subject to or who have resisted additional screening procedures—who are now, will be or have been detained on Guantanamo Naval Base, or any other territory subject to United States jurisdiction or Coast Guard cutters." The Court finds that this class warrants class action treatment under Rule 23(a) and 23(b)(2) because: they are sufficiently numerous; the Government has acted or threatened to act on grounds generally applicable to each member of each class, thus making final declaratory and injunctive relief with respect to each class as a whole appropriate; the plaintiffs are adequate representatives of their classes; and the claims of the named plaintiffs are both common to and typical of the claims of members of the class. Regarding the immediate relative class defined in paragraph 44, the Plaintiffs have presented no evidence whatsoever at trial relating to the claims of the "immediate relative plaintiffs." The Court therefore refuses to certify this class and hereby dismisses their claims.

## II. Collateral estoppel

■ Throughout this action, the Government has maintained that this action is procedurally barred by the outcome of the prior litigation in *Haitian Refugee Center, Inc. v. Baker*, 953 F.2d 1498 (11th Cir.1992). *cert. denied*, —— U.S. ——, 112 S.Ct. 1245, 117 L.Ed.2d 477 (1992). The Second Circuit has twice held in this very case that *Haitian Refugee Center, Inc.* involved (1) different parties, the screened-out Haitians; (2) different claims, challenges to aspects of the old interdiction program that harmed only those screened-out; and (3) circumstances substantially different from those presented here. *Haitian Centers Council, Inc. v. McNary*, 969 F.2d 1326, 1331 (2d Cir.1992) (hereinafter "*HCC I*"); *Haitian Centers Council v. McNary*, 969 F.2d 1350, 1354 (2d Cir.1992), *cert. granted*, —— U.S. ——, 113 S.Ct. 52, 121 L.Ed.2d 22 (1992) (hereinafter "*HCC II*"). Therefore, neither collateral estoppel nor res judicata bars the class of screened-in Haitians in U.S. custody at Guantanamo Naval Base, Cuba, from challenging the Government's conduct.

## III. Haitian Service Organizations' First Amendment Rights

Plaintiff Haitian Service Organizations' First Claim for Relief is that the Government has violated their First Amendment right by denying them and their attorneys access to the Screened In Plaintiffs for the purpose of counselling, advocacy and representation.

■ The right of legal and political advocacy organizations to associate with and advise persons regarding their legal rights are modes of political expression protected by the First Amendment. *In re Primus*, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978); *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). While the government may restrict speech and association in a nonpublic forum, its actions must constitute a reasonable means of achieving a legitimate government interest. *See Perry Education Ass'n. v. Perry Local Educators' Ass'n.*, 460 U.S. 37, 50–54, 103 S.Ct. 948, 958–960, 74 L.Ed.2d 794 (1983). Such regulation of speech may not discriminate based on the viewpoint of the speaker. *See Perry Edu-*

*cation Ass'n.*, 460 U.S. at 37, 46, 103 S.Ct. at 948, 955. However, the Government fails to establish a legitimate interest when it opens a nonpublic forum to some, but excludes others who seek to speak, based on the content of their speech. *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1031 (2d Cir.1985) (prison commissioner's decision to exclude a report on prison conditions to prison inmates exceeded his discretion because his "decision to ban the ... [r]eport *was based solely on his distaste for its message*") (emphasis added).

■ The First Amendment says that "Congress shall make no Law ... abridging the freedom of speech." U.S. Const. amend. I. That provision applies on Guantanamo Bay Naval Base, which is under the complete control and jurisdiction of the United States government, and where the government exercises complete control over all means of delivering communications. *See generally Flower v. United States*, 407 U.S. 197, 198–99, 92 S.Ct. 1842, 1843–44, 32 L.Ed.2d 653 (1972) (First Amendment applicable to U.S. conduct on a military base); *Lamont v. Woods*, 948 F.2d 825, 835 (2d Cir.1991) (Establishment Clause of the First Amendment applies extraterritorially). The Government has violated the Haitian Service Organization's First Amendment rights to free speech and to associate for the purpose of providing legal counsel by denying them equal access to the screened-in Haitians held on Guantanamo. Defendants have permitted press, clergy, politicians and other non-lawyers to meet with the Haitians and have permitted many others, including non-citizen contract workers, onto the base. In addition, the Haitians have received legal advice, which has often been erroneous, from the military, the INS, the Community Relations Service and even military doctors. The legal rights and options of Haitian detainees are discussed on Guantanamo, but only from the viewpoint of which the Government approves.

The Government has frequently cited *Ukrainian–American Bar Ass'n. v. Baker*, 893 F.2d 1374 (2d Cir.1990), in support of its argument that the Haitian Service Organizations have no First Amendment right of access to an alien in the custody of the United States. The Court believes that case can be

distinguished. In *Ukrainian–American Bar Ass'n. v. Baker,* the plaintiff attorneys sought access, at government expense, to a forum to which no other non-governmental person had been given access, *id.* at 1381–82, and where the restrictions at issue were neither content- nor view point-based. *Id.* at 1381. More- over, in *Ukrainian–American,* plaintiffs sought access to a *potential* alien client who had neither retained the plaintiff as counsel nor asserted a right to speak with counsel. *Id.*

Here, the Haitian Service Organizations have been retained by the Screened In Plain- tiffs and have asserted a right to speak with their clients, the screened-in Haitians. The lawyers here seek only to communicate, at their own expense, with clients who have specifically sought them out. Countless per- sons other than the Haitians' lawyers have been permitted to visit, to consult with, and to give advice to the Haitians detained at Guantanamo. The Court thus finds that the lawyers for the Haitian Service Organiza- tions have been barred because of the view- point of the message they seek to convey to the Haitians, in violation of the First Amend- ment. Such Government discrimination against disfavored viewpoints strikes at the heart of the First Amendment. *See, e.g., Travis v. Owego—Apalachian School Dist.,* 927 F.2d 688, 693–94 (2d Cir.1991). The right of the Haitian Service Organizations to impart information or otherwise exercise their own First Amendment rights does not depend on whether the screened-in Haitians have an independent right to counsel. *See Procunier v. Martinez,* 416 U.S. 396, 408–09, 94 S.Ct. 1800, 1808–09, 40 L.Ed.2d 224 (1974) (First Amendment rights of correspondents to uncensored communication with prisoners does not depend on the status of prisoners' claim). That aliens are inside a detention camp does not "bar free citizens from exer- cising their own constitutional rights by reaching out to those on the 'inside,'" *Thorn- burgh v. Abbott,* 490 U.S. 401, 407, 109 S.Ct. 1874, 1878, 104 L.Ed.2d 459 (1989) (citation omitted). Therefore, the Court does not reach the question of whether the Haitian detainees at Guantanamo have a First Amendment right.

## IV. Due Process

■ Plaintiffs' Third Claim for Relief in the Amended Complaint states that the Gov- ernment has violated the Screened In Plain- tiffs' due process rights under the Fifth Amendment. The Due Process Clause is phrased in universal terms, protecting any "person," rather than members of "the peo- ple." U.S. Const. Amend. V. The U.S. Na- val Base at Guantanamo Bay, Cuba, is sub- ject to the exclusive jurisdiction and control of the United States where the criminal and civil laws of the United States apply. *HCC I,* 969 F.2d at 1342 (citing *United States v. Lee,* 906 F.2d 117, 117 & n. 1 (4th Cir.1990). The courts have protected the fundamental con- stitutional rights of noncitizens in other terri- tories subject to exclusive U.S. jurisdiction and control, including the former American Sector of Berlin, the Canal Zone, and the Pacific Trust Territories. *United States v. Tiede,* 86 F.R.D. 227, 249–53 (U.S.Ct. Berlin 1979), *Government of Canal Zone v. Scott,* 502 F.2d 566, 568 (5th Cir.1974), *Ralpho v. Bell,* 569 F.2d 607, 618–19 (D.C.Cir.1977), *Nitol v. United States,* 7 Cl.Ct. 405 (1985).

■ The Supreme Court has long held that aliens outside the United States are entitled to due process in civil suits in United States courts. *Asahi Metal Indus. Co. v. Superior Court of California,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Consti- tutional and other fundamental rights apply to citizens and noncitizens outside the United States who encounter official U.S. action. *Asahi Metal Indus. Co.,* 480 U.S. 102, 107 S.Ct. 1026; *Reid v. Covert,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); *United States v. Streifel,* 665 F.2d 414 (2d Cir.1981); *United States v. Toscanino,* 500 F.2d 267 (2d Cir.1974).

■ As the Second Circuit decided, there is "no principled basis for concluding that the 'screened in' plaintiffs detained at the base would have fewer substantive rights" than aliens "arrested and accused … at Guanta- namo." *HCC I,* 969 F.2d at 1343. Moreover, it would not be "incongruous or overreaching to conclude that the United States Constitu- tion limits the conduct of United States per- sonnel with respect to officially authorized

interactions with aliens brought to and detained by such personnel on a land mass exclusively controlled by the United States." *HCC I*, 969 F.2d at 1343. Nor would it be either "impracticable" or "anomalous" to apply the Due Process Clause to screened-in Haitians held in U.S. custody on Guantanamo. These

> "interdicted Haitians are not 'some undefined, limitless class of noncitizens who are beyond our territory,' they are instead an identifiable group of people who were interdicted by Americans in international waters pursuant to a binding Agreement Between the United States of America and Haiti, and who have been detained on territory that is subject to the exclusive control of the United States. . . . [I]n this case the United States has exercised its 'undoubted power . . . to take actions to assert its legitimate power and authority abroad,' . . . in both interdicting and bringing these Haitians to territory controlled by the United States."

*HCC I*, 969 F.2d at 1343 (citations omitted). These Haitians are at a military base solely because defendants chose to take them there. The United States government has already bound itself by treaty not to "impose penalties" on persons it has recognized as refugees, who flee to the United States "directly from a territory where their life or freedom was threatened" on account of political persecution. U.N. Refugee Convention, art. 31.1. If the Due Process Clause does not apply to the detainees at Guantanamo, Defendants would have discretion deliberately to starve or beat them, to deprive them of medical attention, to return them without process to their persecutors, or to discriminate among them based on the color of their skin.

When this Court issued the first preliminary injunction in this case, it found that the Haitian detainees had a due process right to counsel under the Fifth Amendment. The Government has continued to detain the Screened In Plaintiffs. In fact, the Haitian detainees have been confined for nearly two years. As the Haitians' ties to the United States have grown, so have their due process rights. *Johnson v. Eisentrager*, 339 U.S. 763, 770–71, 70 S.Ct. 936, 939–40, 94 L.Ed.

1255 (1950). The Haitian detainees are imprisoned in squalid, prison-like camps surrounded by razor barbed wire. They are not free to wander about the base. Guarded by the military day and night, the Screened In Plaintiffs are subject to surprise pre-dawn military sweeps conducted by soldiers outfitted in full riot gear searching for missing detainees. Haitian detainees have been punished for rule infractions by being flexicuffed and sent to "administrative segregation camp" (Camp Alpha or Camp 7) or the brig. Such conditions cannot be tolerated when, as here, the detainees have a right to due process.

## A. Access to Counsel During "Well-Founded" Interviews

■■■■ The Screened In Plaintiffs have a protected liberty interest in not being wrongly repatriated to Haiti, *Yiu Sing Chun v. Sava*, 708 F.2d 869, 877 (2d Cir.1983), and to due process before defendants alter their screened in status. *HCC I*, 969 F.2d at 1345. The Haitian detainees also have a protected liberty interest in their "reasonable expectation" of avoiding erroneous return based on the affirmative actions of the Executive and Congress. *HCC I*, 969 F.2d at 1345 (citing *United States ex rel. Paktorovics v. Murff*, 260 F.2d 610, 614 (2d Cir.1958)).

■■■■ A protected liberty or property interest cannot be denied without constitutionally adequate due process. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *Augustin v. Sava*, 735 F.2d 32 (2d Cir.1984). To determine what process is due, the Court must balance three factors: "(a) the private interest involved, (b) the risk of an erroneous deprivation of that interest through the procedures utilized, as well as the probable value of additional procedural safeguards, and (c) the government's interest, including the burden that additional procedural requirements would impose." *United States v. All Assets of Statewide Auto Parts, Inc.*, 971 F.2d 896, 902 (2d Cir.1992). *See Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); *Baden v. Koch*, 799 F.2d 825, 831 (2d Cir.1986).

■ First, the private interest of the Screened In Plaintiffs not to be returned to Haiti is of the highest order. Based on the INS's own findings, the screened-in Haitians have already been found to have at least a credible fear of return. This showing exceeds that of an unscreened asylum applicant in the United States whose interest in applying for asylum is constitutionally protected. *See Orantes–Hernandez v. Smith,* 541 F.Supp. 351, 377 (C.D.Cal.1982), *aff'd. Thornburgh v. Orantes–Hernandez,* 919 F.2d 549 (9th Cir.1990) (asylum applicant—who has not yet made any showing of persecution—has liberty interest in not being erroneously denied asylum). *See Azzouka v. Sava,* 777 F.2d 68, 74 (2d Cir.1985) (right to apply for political asylum is a constitutionally protected interest which triggers the safeguards of the due process clause); *Augustin v. Sava,* 735 F.2d 32, 37 (2d Cir.1984) (same); *Yiu Sing Chun v. Sava,* 708 F.2d 869, 877 (2d Cir.1983) (right to resist return to persecution).

Second, the risk of erroneous deprivation and the benefits of additional procedural safeguards are equally great. Absent a proper and fair adjudication, the screened-in Haitians' legitimate claims are likely to be denied either at the initial screening or in the final adjudication. The evidence establishes, and defendants concede, that representation by counsel and recourse to the processes available to asylum applicants in the United States, such as access to counsel before, during and after the interview, an opportunity to respond to a Notice of Intent to Deny, and administrative and judicial review, provide a significant benefit to asylum applicants undergoing the well-founded fear determination in general and to screened-in Haitians at Guantanamo in particular. "Permitting access to attorneys is a reasonable method to insure that the 'screened-in' plaintiffs are not wrongly repatriated to a country in which they have already been found by our government to have a credible fear of being persecuted." *HCC I,* 969 F.2d at 1346.

Finally, the only burden the government has alleged in connection with affording the Haitians procedural due process is associated with possible delays in adjudicating claims and the impact of deploying INS personnel to Guantanamo. Yet the evidence shows that much of any delay is attributable to actions by the government, not the applicant. Furthermore, all of the purported governmental burden would be eliminated if the remaining Haitian detainees were brought to the United States to be integrated into the domestic asylum process. The Court concludes that a balancing of the three *Mathews* factors requires that the process due screened-in Haitians at Guantanamo who are subjected to well-founded fear interviews is the process that is available to asylum applicants in the United States. *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893 (1976).

### B. *Medical Care*

■ Constitutional due process mandates both provision of adequate medical care to persons in official custody, *Revere v. Massachusetts General Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983), and "safe conditions". *Youngberg v. Romeo,* 457 U.S. 307, 315–16, 102 S.Ct. 2452, 2457–58, 73 L.Ed.2d 28 (1982). *See generally DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 1005–1006, 103 L.Ed.2d 249 (1989). As persons in coercive, nonpunitive, and indefinite detention, the Haitian detainees on Guantanamo are constitutionally entitled to medically adequate conditions of confinement.

■ Courts have consistently held, in a variety of contexts, that the due process rights of persons in nonpunitive detention are greater than the Eighth Amendment protections afforded to convicted prisoners. *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979) (pretrial detention); *Youngberg,* 457 U.S. at 321–22, 102 S.Ct. at 2461 (involuntary commitment); *Rhyne v. Henderson County,* 973 F.2d 386, 391 (5th Cir.1992) (pretrial detainees); *Martin v. Gentile,* 849 F.2d 863, 870 (4th Cir.1988) (pretrial detainee). Persons in nonpunitive detention have a right to "reasonable medical care", a standard demonstrably higher than the Eighth Amendment standard that protects convicted prisoners: "deliberate indifference to serious medical

needs." *Compare Estelle ·v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) *with Rhyne v. Henderson County*, 973 F.2d at 391; *Cupit v. Jones*, 835 F.2d 82, 85 (5th Cir.1987).

At a minimum, due process forbids governmental conduct that is deliberately indifferent to the medical needs of nonconvicted detainees. *Hill v. Nicodemus*, 979 F.2d 987, 991–92 (4th Cir.1992) (including psychological condition); *Gordon v. Kidd*, 971 F.2d 1087, 1094 (4th Cir.1992); *Bowen v. Manchester*, 966 F.2d 13, 16–17 (1st Cir. 1992); *Hall v. Ryan*, 957 F.2d 402, 406 & n. 6 (7th Cir.1992) (including risk of suicide); *Barber v. City of Salem*, 953 F.2d 232, 238 (6th Cir.1992); *Elliot v. Cheshire County*, 940 F.2d 7, 10 (1st Cir.1991); *Liscio v. Warren*, 901 F.2d 274, 276–77 (2d Cir.1990). Deliberate indifference to medical needs includes government officials' denial or delay of detainees' access to medical care, interfering with treatment once prescribed, or their lack of response to detainees' medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104–05, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986); *Todaro v. Ward*, 565 F.2d 48, 52–53 (2d Cir.1977). Deliberate indifference to medical needs also includes government officials rejection of recommendations or requests for medical treatment by their own medical doctors that exposes the person detained to undue suffering or serious medical risk. *See Scharfenberger v. Wingo*, 542 F.2d 328, 331, 332 (6th Cir.1976); *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir.1976); *Elliot*, 940 F.2d at 10; *Youngberg*, 457 U.S. at 323, 102 S.Ct. at 2462.

The military's own doctors have made INS aware that Haitian detainees with T-cell counts of 200 or below or percentages of 13 or below should be medically evacuated to the United States because of a lack of facilities and specialists at Guantanamo. Despite this knowledge, Defendant INS has repeatedly failed to act on recommendations and deliberately ignored the medical advice of U.S. military doctors that all persons with T-cell count below 200 or percentages below 13 be transported to the United States for treatment. Such actions constitute deliberate indifference to the Haitians' medical needs in violation of their due process rights.

### C. Disciplinary Proceedings

Plaintiffs also assert that the military's disciplinary procedures violate their due process rights. Detained aliens, like prisoners, are entitled to due process protection against arbitrary discipline. *Orantes–Hernandez v. Smith*, 541 F.Supp. at 385. When a "major change in the conditions of confinement" is imposed as punishment for a specific infraction, *Wolff v. McDonnell*, 418 U.S. at 571 n. 19, 94 S.Ct. at 2982 n. 19, the Due Process Clause requires a constitutionally adequate process. *Bell v. Wolfish*, 441 U.S. at 535, 537–38, 99 S.Ct. at 1871, 1873; *Woodson v. Lack*, 865 F.2d 107 (6th Cir. 1989). For example, the Second Circuit has held that confinement of fourteen days or more in a "special housing unit", *McCann v. Coughlin*, 698 F.2d 112, 119, 121–22 (2d Cir. 1983), or in one's own quarters, *McKinnon v. Patterson*, 568 F.2d 930, 936–37 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), is a "sufficiently serious deprivation" of a liberty interest to implicate the Due Process Clause. *McCann*, 698 F.2d at 120–22. At Guantanamo, the JTF places Haitian detainees exhibiting behavioral problems in "administrative segregation." When a detainee is "segregated," he is removed from the general population and placed in Camp 7, Camp Alpha or the brig for a few days or a few weeks. The Court finds this "administrative segregation" to be tantamount to punishment constituting a deprivation of liberty and raising procedural due process issues.

Courts have held that before the imposition of such punishment, due process requires written notice of the allegations, a hearing, a written decision, an opportunity to call witnesses and present evidence, access to counsel, and an impartial decisionmaker. *Wolff*, 418 U.S. 539, 563–70, 94 S.Ct. 2963, 2978–82; *McCann*, 698 F.2d at 122. JTF commanders have employed various "informal" procedures for addressing behavioral problems among the detainees and between the JTF and the detainees. These procedures have included informing the detainee

of the allegations made against him, providing an opportunity to respond, speaking with the president of the camp and a final determination by a senior military officer. However, none of these procedures have included written notice, a hearing, an opportunity to call witnesses, access to counsel, or guarantee of an impartial decisionmaker. Therefore, the Court finds that the JTF's informal "administrative segregation" procedures to be violative of the detainees' procedural due process rights.

### D. *Indefinite Detention*

■ As individuals held in custody by the United States, the Screened In Plaintiffs also have a liberty interest in not being arbitrarily or indefinitely detained. *O'Connor v. Donaldson,* 422 U.S. 563, 576, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396 (1975) (involuntarily committed mental patient); *McNeil v. Director, Patuxent Institution,* 407 U.S. 245, 250, 92 S.Ct. 2083, 2087, 32 L.Ed.2d 719 (1972) (convict who completed sentence but continued to be held in mental hospital); *Doherty v. Thornburgh,* 943 F.2d 204, 209 (2d Cir.1991) (alien detained pending deportation); *United States v. Gonzales Claudio,* 806 F.2d 334, 339 (2d Cir.1986) (pre-trial detainee). Courts have upheld continued detention where (1) there are valid reasons for it, i.e. where the alien possesses a criminal record or constitutes a national security risk, see e.g. *Shaughnessy v. United States,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953); *Alvarez–Mendez v. Stock,* 941 F.2d 956 (9th Cir.1991), (2) the alien bears some responsibility for delaying the process, and (3) the detention will eventually end. *Doherty,* 943 F.2d at 211–12.

■ Here, the Screened In Plaintiffs' continued detention is the result of the Defendants' actions, not the aliens' own choices. The Government stopped processing the cases of these and other screened-in Haitians in June 1992, after the Second Circuit upheld this Court's injunction entitling the Haitians to be represented by counsel. One-hundred and fifteen Haitians at Guantanamo have met the well-founded fear standard in the second interviews and have remained in detention for almost two years.

Even now, the INS has not stated when these individuals' claims will finally be adjudicated and when any subsequent parole determinations will be made. Nor has the INS stated what it will do with those Haitians who are ultimately denied parole into the United States, but who have demonstrated a well-founded fear of persecution if returned to Haiti. Testimony revealed that the Haitians were told that they could be at Guantanamo for 10–20 years or possibly until a cure for AIDS is found. Continued detention constitutes a denial of due process where there is no guarantee that "detention will end when [plaintiffs have] exhausted [their] remedies under our laws." *Bertrand,* 684 F.2d 204, 207 n. 6 (2d Cir.1982) *see also United States v. Gonzales–Claudio,* 806 F.2d 334, 341 (2d Cir.1986).

Finally, the detained Haitians are neither criminals nor national security risks. Some are pregnant mothers and others are children. Simply put, they are merely the unfortunate victims of a fatal disease. The Government has failed to demonstrate to this Court's satisfaction that the detainees' illness warrants the kind of indefinite detention usually reserved for spies and murderers. *Cf. Shaughnessy v. United States,* 345 U.S. 206, 73 S.Ct. 625 (1953); *Alvarez–Mendez v. Stock,* 941 F.2d 956 (9th Cir.1991). Where detention no longer serves a legitimate purpose, the detainees must be released. The Haitian camp at Guantanamo is the only known refugee camp in the world composed entirely of HIV+ refugees. The Haitians' plight is a tragedy of immense proportion and their continued detainment is totally unacceptable to this Court. *See Rubinstein v. Brownwell,* 206 F.2d 449, 456 (D.C.Cir.1953), *aff'd,* 346 U.S. 929, 74 S.Ct. 319, 98 L.Ed. 421 (1954); *Lie v. Greene,* 767 F.Supp. 1087, 1091 (D.Colo.1991) (detainees must be released where detention no longer serves a legitimate purpose).

### IV. *Violations of Administrative Procedure Act*

■ For their Fifth Claim for Relief, Plaintiffs allege that a) the Government violated the APA by conducting unauthorized "well-founded fear" interviews and b) the

Attorney General abused her discretion by denying parole for the screened-in Haitian Plaintiffs. The Administrative Procedure Act, 5 U.S.C. §§ 701, 706(2) (1982), authorizes this Court, at the request of aggrieved persons, to "hold unlawful and set aside agency action [that is] . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] (C) in excess of statutory jurisdiction, authority, or limitations . . . ." Defendants' decisions in relation to the processing and detention of Haitians at Guantanamo constitute final "agency action," because "the agency has completed its decision making process, and . . . the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts,* — U.S. —, —, 112 S.Ct. 2767, 2773, 120 L.Ed.2d 636 (1992). As persons "adversely affected or aggrieved by agency action," 5 U.S.C. § 702, the Screened In Plaintiffs have a cause of action under the APA for injunctive relief against defendant officials. Nonresident aliens located outside the United States qualify as "aggrieved persons" with standing to obtain review in U.S. courts of the legality of U.S. governmental actions that adversely affect them. *See, e.g., Juarez v. I.N.S.* 732 F.2d 58 (6th Cir.1984); *Silva v. Bell,* 605 F.2d 978, 984–85 (7th Cir. 1979); *Mendez v. I.N.S.,* 563 F.2d 956 (9th Cir.1977); *Constructores Civiles de Centroamerica S.A. (Concica) v. Hannah,* 459 F.2d 1183, 1191–92 (D.C.Cir.1972).

### A. Conduct In Excess of Statutory Authority

■ The APA authorizes reviewing courts "to hold unlawful and set aside agency action . . . in excess of statutory . . . authority . . . ." 5 U.S.C. § 706(2). "It is 'central to the real meaning of "the rule of law," [and] not particularly controversial' that a federal agency does not have the power to act unless Congress, by statute, has empowered it to do so." *Transohio Sav. Bank v. Director, Office of Thrift Supervision,* 967 F.2d 598, 621 (D.C.Cir.1992) (citations omitted); *Chrysler Corp. v. Brown,* 441 U.S. 281, 302, 99 S.Ct. 1705, 1718, 60 L.Ed.2d 208 (1979). Agency actions that do not fall within the scope of a statutory delegation of authority are *ultra vires* and must be invalidated by reviewing

courts. *Id. See also SEC v. Sloan,* 436 U.S. 103, 118–19, 98 S.Ct. 1702, 1711–12, 56 L.Ed.2d 148 (1978); *Civil Aeronautics Bd. v. Delta Air Lines, Inc.,* 367 U.S. 316, 334, 81 S.Ct. 1611, 1623, 6 L.Ed.2d 869 (1961); 5 U.S.C. §§ 701, 706(2)(C) (1988) (authorizing judicial review of agency actions "in excess of statutory jurisdiction, authority, or limitations").

■ In the immigration field, the authority of the executive "is limited to the zone charted by Congress. If such [executive] officers depart from the channels of authority fixed by statute they act illegally." C. Gordon & S. Mailman, 1 Immigration Law & Practice § 9.02, at 9–519, *citing Mahler v. Eby,* 264 U.S. 32, 44 S.Ct. 283, 68 L.Ed. 549 (1924); *Gegiow v. Uhl,* 239 U.S. 3, 9–10, 36 S.Ct. 2, 3 (1915) (defendant's effort to exclude an alien on a different basis from that authorized by Congress was beyond the scope of defendant's authority and therefore invalid). *See also Lloyd Sabaudo Societa Anonima Per Azioni v. Elting,* 287 U.S. 329, 335, 53 S.Ct. 167, 170, 77 L.Ed. 341 (1932) (courts may review executive action in immigration field to ensure compliance with grant of statutory authority).

■ Courts will invalidate executive action that is unsupported by express statutory authority. *See, e.g., Jean v. Nelson,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985), *Rodriguez–Fernandez v. Wilkinson,* 654 F.2d 1382, 1389–90 (10th Cir.1981) (plaintiff ordered released because INS lacked statutory authority to detain Mariel Cuban indefinitely). *Bertrand v. Sava,* 684 F.2d 204, 210, 212 & n. 12 (2d Cir.1982); *American Baptist Churches v. Meese,* 712 F.Supp. 756, 774 (N.D.Cal.1989). Only two provisions of the INA authorize the INS to adjudicate claims of persons seeking refuge from political persecution: Section 207, which governs overseas refugee processing, and Section 208, which governs asylum for aliens at a land border or physically present in the U.S.

■ In the Refugee Act of 1980 Congress had two goals. First, it established Sections 207 and 208 as the exclusive mechanisms for determining whether persons meet the refugee definition. *INS v. Stevic,* 467 U.S. 407,

425–27, 104 S.Ct. 2489, 2498–99, 81 L.Ed.2d 321 (1984); *Amanullah v. Nelson*, 811 F.2d 1, 12 (1st Cir.1987). Second, Congress explicitly restricted the Attorney General's use of the "parole authority" to circumvent the carefully structured system established by § 207 and § 208. *Amanullah*, 811 F.2d at 12.

> Amid growing dissatisfaction with the existing law, Congress in 1980 comprehensively revised the standards and procedures governing asylum. *See* The Refugee Act of 1980, Pub. L. No. 96–212. 94 Stat. 102. This legislation replaced the attorney general's *ad hoc parole authority* with a systematic procedure for adjudicating asylum claims that was intended to eliminate geographical and ideological factors from consideration.

*Doherty v. I.N.S.*, 908 F.2d 1108, 1119 (2d Cir.1990), *rev'd on other grounds,* —— U.S. ——, 112 S.Ct. 719, 116 L.Ed.2d 823 (1992) (emphasis added). *See also Mason v. Brooks*, 862 F.2d 190, 194 (9th Cir.1988); H.R.Rep. No. 608; S.Rep. No. 256, 96th Cong., 2d Sess. 1 (1980), *reprinted in* 1980 U.S.C.C.A.N. 141, 141 (the Refugee Act "places into law what we do for refugees now by custom, and on an *ad hoc* basis, through the use of the 'parole authority' in Section 212(d)(5)....").

By defendants' own admission, the process to which screened-in Haitians have been subjected is "extra-statutory," and a "third thing" nowhere authorized by either § 207 or § 208. The Rees Memorandum sets forth an *ad hoc* procedure for processing the Haitian plaintiffs that plainly violates both goals of the Refugee Act. First, it establishes a process that, by Rees' repeated admission, is *neither* § 207 nor § 208, but rather, a hybrid "third thing" that comports with neither statutory grant of power to the INS. Well-founded fear adjudications at Guantanamo are neither refugee determinations nor asylum determinations, because Haitians who establish such claims are not brought to the U.S. as refugees under § 207 or granted asylum under § 208. Instead, the Rees Memorandum subjects the Screened In Plaintiffs to a process that lacks the benefits of both § 207 and § 208. Unlike all other

§ 207 applicants, Haitians at Guantanamo are detained in custody under the authority of the United States, are not free to leave or to go to a third country, are deprived of any opportunity to consult counsel or advocates, and may be forcibly repatriated by the United States. Unlike § 208 applicants, Guantanamo Haitians are deprived of all the procedural safeguards and guarantees to which they would be entitled if they were in the United States and are subjected to medical screening and HIV testing, which are not done and are not relevant to asylum determinations. Second, the Rees Memorandum uses the parole authority as a means of circumventing § 207 and § 208, precisely the artifice Congress sought to forbid. The parole authority does not authorize the establishment of a system contrary to Congress' intent and intentionally targeted at persons who would be eligible to participate in the asylum process but for the fact that the government affirmatively interdicted them. The parole authority cannot be "employed to facilitate a continuing deprivation of [detainees'] constitutional rights." *See Nguyen Da Yen v. Kissinger*, 528 F.2d 1194, 1199 (9th Cir.1975). Neither can the parole authority be employed to facilitate a continuing deprivation of detainees' statutory rights under the § 207 or § 208 processes authorized by Congress. Defendants lack the authority to establish and maintain a non-statutory system for processing "well-founded fear of persecution" claims of Haitians detained at Guantanamo.

**B.** *Abuse of Discretion/Arbitrary and Capricious Conduct*

Plaintiffs allege that the Attorney General's refusal to parole them from detention due to their HIV + status constitutes an abuse of discretion. For the reason set forth below, the Court agrees and sets aside her denial of parole.

The statute authorizing parole, INA § 212(d)(5), permits the Attorney General temporarily to "parole" aliens *out of detention* "for emergent reasons or for reasons deemed strictly in the public interest...." *Jean*, 472 U.S. at 855, 105 S.Ct. at 2997) *citing* 8 U.S.C. § 1182(d)(5)(A) (1982); *Ber-*

**1048**

*trand,* 684 F.2d at 212 n. 12. Although the statute may not be used to circumvent the § 207 or § 208 processes, it permits the temporary release from detention of aliens with serious medical conditions. The Government's obstinate refusal to parole Haitians with HIV out of detention constitutes an abuse of the Attorney General's discretion. *Moret v. Karn,* 746 F.2d 989, 992 (3d Cir. 1984).

 The Attorney General has "broad discretionary power to parole unadmitted aliens," but she may not exercise that discretion "to discriminate invidiously against a particular race or group or to depart without rational explanation from established policies." *Bertrand,* 684 F.2d at 212 *citing Wong Wing Hang v. I.N.S.,* 360 F.2d 715, 719 (2d Cir.1966). *See also Jean v. Nelson,* 472 U.S. at 857, 105 S.Ct. at 2998 (INS officials concede that parole regulations do not authorize discrimination on the basis of race and national origin). The APA, 5 U.S.C. § 706(2) (1982), authorizes this Court to "hold unlawful and set aside agency action ... found to be an abuse of discretion." Because the Attorney General's parole-related discretion is limited, such decisions "may be reviewed under the judicial review provisions of the APA." *Moret v. Karn,* 746 F.2d at 991.

 Courts may find that the Attorney General abused her discretion upon any of three findings: first, that she has exercised her discretion to discriminate invidiously, *Bertrand,* 684 F.2d at 212; second, that the Attorney General or her agents have deviated from their own internal regulations. *Jean,* 472 U.S. at 855–56, 105 S.Ct. at 2997–98; *Moret,* 746 F.2d at 992–93; *Haitian Refugee Center v. Civiletti,* 503 F.Supp. 442, 452 (S.D.Fla.1980), *aff'd as modified, Haitian Refugee Center v. Smith,* 676 F.2d 1023, 1041 n. 48 (5th Cir.1982), and third, that she has given "effect 'to considerations that Congress could not have intended to make relevant,'" *Doherty,* 908 F.2d at 1117–18 (citations omitted); *D.C. Federation of Civic Ass'ns v. Volpe,* 459 F.2d 1231, 1248 (D.C.Cir.1971), *cert. denied,* 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972).

By effectively denying the plaintiffs release from detention, defendant Attorney General has abused her discretion in all three ways. First, Haitians remain in detention solely because they are Haitian and have tested HIV-positive. The Government has admitted that the ban on the admission of aliens with communicable diseases has not been strictly enforced against every person seeking entry. Each year many "non-immigrants" enter the United States, are legally entitled to remain for years, and are not subject to HIV testing. To date, the Government has only enforced the ban against Haitians.

Second, Defendants' refusal to release plaintiffs from detention represents an unjustified deviation from established parole policy. The parole regulations, 8 C.F.R. § 212.5, with respect to individuals who do not otherwise present a security risk or a risk of absconding, expressly list factors that should guide the INS's discretion in determining whether an individual's release from detention would be "strictly in the public interest. The regulations authorize the parole of aliens with serious medical conditions out of detention for "emergent reasons." 8 C.F.R. § 212.5(a)(1). The Government cannot dispute that the Haitians' HIV + condition constitutes a "serious medical condition." An individual who carries the virus inevitably develops AIDS and dies. To date, there is no known cure. The HIV + Haitian detainees have been held in virtual prison camps for over eighteen months. Moreover, Defendants' refusal to release plaintiffs from detention due to their HIV status departs from the INS' own stated policy respecting release of persons who have demonstrated a credible fear of persecution, which *excludes* medical status and HIV infection from the permissible criteria for continued detention. Indeed, the *only* pertinent parole regulation explicitly provides that "serious medical conditions" constitute "emergent reasons," such that "continued detention would not be appropriate." 8 C.F.R. 212.5(a)(1). Neither the general parole regulations contained in 8 C.F.R. § 212.5, nor the specific agency guidelines pertaining to parole for asylum-seekers, authorize denying parole based on an alien's HIV status. Insofar as defendants have de-

liberately bypassed the only parole regulation that applies to this situation, they have deviated from their own regulations and hence abused their discretion. *See Jean,* 472 U.S. at 856–57, 105 S.Ct. at 2997–98; *Moret,* 746 F.2d at 992–93.[7]

 Finally, in invoking the HIV ban to deny the Haitian detainees parole, the Attorney General has given "effect to 'considerations that Congress could not have intended to make relevant'." *Doherty v. I.N.S.,* 908 F.2d at 1117–8, *Volpe,* 459 F.2d at 1248). In applying 8 U.S.C.A. § 1182(a)(1)(A)(i) to deny the Haitian detainees parole, the Attorney General has misinterpreted the statute. There is no mandatory HIV exclusion for either parole (the means by which interdicted aliens who are screened in are brought to the United States in order to pursue their asylum claims) or the grant of asylum in the United States. The statute merely makes aliens with certain communicable diseases excludable from "admission" to the United States, and even the amendment to the statute which recently passed both houses of Congress adds HIV as a communicable disease.[8] The statute *does not* mandate such exclusion. Congress grants the Attorney General the power to temporarily parole out of detention aliens otherwise excludable from admission. *See* 8 U.S.C. § 1182(d). In determining whether aliens will be paroled out of detention, Congress found that the Attorney General should consider "[t]he parole of aliens who have serious medical conditions in which continued detention would not be appropriate." Where HIV + detainees have been held for nearly two years in prison camp conditions likely to further compromise their health, where each year other individuals carrying the HIV virus are allowed to enter the United States, and where the admission of the Haitians is unlikely to affect

the spread of AIDS in this country,[9] the Government's continued imprisonment of the Screened In Plaintiffs serves no purpose other than to punish them for being sick. Moreover, the requested relief of release from detention is very limited, since parole out of confinement neither constitutes permanent "admission" into the United States nor otherwise "affects an alien's status," INA § 212(d)(5); *Leng May Ma v. Barber,* 357 U.S. 185, 188, 78 S.Ct. 1072, 1074 (1958). Thus, after a Haitian is paroled, the government may still rely on any applicable ground to exclude that individual before choosing to confer formal "admission" into the United States. INA § 212(d)(5)(A).

The Attorney General has abused her discretion in failing to parole the HIV + Haitian detainees on Guantanamo. Her decision to detain these Haitians deviates from established parole policy and is illegally based upon a statute which is selectively enforced against Haitian nationals and merely makes persons carrying the HIV virus excludable from "admission" or permanent residence. For foregoing reasons, the Court hereby sets aside the Attorney General's denial of parole.

Having found the Government's "well-founded" processing to be extra-statutory and that the Attorney General abused her discretion in denying parole, the Court need not reach Plaintiffs' equal protection claim.

## RELIEF

For the reasons stated above,

1. The following class is hereby certified:

(a) all Haitian citizens who have been or will be "screened in" who are, have been or will be detained on Guantanamo Bay Naval Base, or any other territory subject to United States jurisdiction, or on Coast Guard cutters, including those who have been or will

---

7. INS regulations explicitly prohibit the exercise of parole discretion in a manner that discriminates based on race or national origin, *Jean v. Nelson,* 472 U.S. at 856, 105 S.Ct. at 2998. Insofar as the national origin of these asylum-seekers is a relevant factor in the government's refusal to parole plaintiffs, the government's refusal to release the Haitians from detention also represents an unjustified departure from its own policy and hence is arbitrary, capricious, and an abuse of discretion.

8. H.R.Rep. No. 100, 103rd Cong., 1st Sess. 93 (1993).

9. At trial, the Court heard testimony that the admission of the Haitian detainees will increase the AIDS population by only a fraction of one percent.

be subject to post-screening processing (or who have resisted such processing) (hereinafter "Screened In Plaintiffs");

2. It is hereby,

(a) DECLARED that the "Well–Founded Fear" Processing by Defendants set forth in the Rees Memorandum is in excess of Defendants' statutory authority, and

(b) ORDERED that such "Well–Founded Fear" Processing be permanently enjoined, held unlawful and set aside pursuant to the Administrative Procedure Act; and

(3) It is hereby further

(a) DECLARED that defendant Attorney General's exercise of the statutory parole power under INA § 212(d)(5) to deny Screened In Plaintiffs parole out of detention constitutes an abuse of discretion; and

(b) ORDERED that defendant Attorney General's exercise of the statutory parole power under INA § 212(d)(5) to deny Screened In Plaintiffs parole out of detention be permanently enjoined, held unlawful and set aside pursuant to the Administrative Procedure Act; and

(4) It is hereby further

(a) DECLARED that the "Well–Founded Fear" Processing, Disciplinary Proceedings, Arbitrary and Indefinite Detention, Medical Care and Camp Conditions to which Screened In Plaintiffs are being subjected by Defendants denies those plaintiffs Due Process of Law; and

(b) ORDERED that such "Well–Founded Fear" Processing, Disciplinary Proceedings, Arbitrary and Indefinite Detention, Medical Care and Camp Conditions be permanently enjoined pursuant to the Fifth Amendment of the United States Constitution; and that Screened In Plaintiffs be immediately released (to anywhere but Haiti) from such processing, proceedings, detention, medical care and camp conditions; and

(5) It is hereby further

(a) DECLARED that denying plaintiff Haitian Service Organizations immediate access to Guantanamo to communicate and associate with their detained Screened In Plaintiff clients violates the First Amendment; and

(b) ORDERED that Defendants are permanently enjoined from denying plaintiff Haitian Service Organizations immediate access at Guantanamo, on Coast Guard Cutters, or at any other place subject to U.S. jurisdiction to any member of the class of Screened In Plaintiffs (regardless of whether any such screened-in plaintiff has been furnished with an exact date and time for an interview), subject to reasonable time, place, and manner limitations for the purpose of providing class members legal counsel, advocacy, and representation; and

(6) It is hereby finally

(a) DECLARED that Plaintiffs are entitled to such other and further relief as the Court may deem just and proper, including reasonable attorneys' fees and costs, to be determined at a future hearing.

So ordered.